**NATIONAL STEEL CAR,
LTD., Plaintiff**

v.

**CANADIAN PACIFIC RAILWAY, LTD.,**
Canadian Pacific Railway Co., 3942503
Canada, Inc., Delaware & Hudson
Railway Company, Inc., Defendants

No. CIV.A. 02–6877.

United States District Court,
E.D. Pennsylvania.

Jan. 6, 2003.

*MEMORANDUM AND ORDER*

MCLAUGHLIN, District Judge.

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .533

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .533

 I. The Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .533

 II. Issuance/Reissuance of the '575 Patent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .534

 III. Dropped Deck Center Beam Flat Cars . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .535

 IV. CPR's Purchase of Dropped Deck Center Beam Cars . . . . . . . . . . . . . . . . . . . . .536

 V. Greenbrier's Indemnification of CPR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .539

 VI. CPR's Use of Dropped Deck Center Beam Cars . . . . . . . . . . . . . . . . . . . . . . . . . .539

 VII. Ownership of Dropped Deck Center Beam Cars . . . . . . . . . . . . . . . . . . . . . . . . . .540

VIII. CPR's Receipt of the Accused Rail Cars . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .540

 IX. Impact on NSC of Not Receiving the CPR Contract . . . . . . . . . . . . . . . . . . . . . . .541

532

X. '575 Patent ............................................................542
 A. Overview ........................................................542
 B. Claims ..........................................................543
 C. Prosecution History.............................................545

XI. Udstad '020 Patent..................................................547

XII. Other Patents and Drawings ........................................548
 A. Wagner '031 Patent .............................................548
 B. Adler '028 Patent ..............................................548
 C. Miller '399 Patent..............................................549
 D. Yang '821 Patent ...............................................549
 E. Miller '676 Patent..............................................549
 F. Baker '887 Patent...............................................550
 G. Harris '041 Patent .............................................550
 H. Harris '175 Patent .............................................551
 I. Lund Drawing ...................................................551
 J. Pritchard Disclosure ...........................................552
 K. Saxton '085 Patent .............................................553

CONCLUSIONS OF LAW AND ADDITIONAL FINDINGS OF FACT ...............553

I. Likelihood of Success on the Merits .................................554
 A. Infringement....................................................554
 1. Do the Accused Rail Cars Infringe the '575 Patent?.........554
 2. Section 272 Defense .......................................555
 a. History of Section 272 ...............................555
 b. Cases Interpreting Section 272........................555
 c. Does Section 272 Apply to the Present Case? ..........556
 (1) Are the Accused Rail Cars Used in a Vehicle of Another
 Country? .......................................556
 (2) Are the Accused Rail Cars Temporarily Present in the
 United States? .................................556
 (3) Are the Accused Rail Cars Used Exclusively for the
 Needs of the Train?.............................557
 (4) Are the Accused Rail Cars Sold in the United States? .........557
 B. Validity .......................................................557
 1. Claim Construction ........................................558
 a. Flat Car .............................................559
 b. Bulkhead .............................................559
 c. Center Beam ..........................................560
 d. Floor ................................................560
 e. Side Sill Transition Means............................561
 2. Anticipation ..............................................561
 3. Obviousness ...............................................563
 a. Scope and Content of Prior Art .......................564
 b. Level of Ordinary Skill...............................565
 c. Differences Between '575 Patent and Prior Art.........565
 (1) Were the Asserted Claims Obvious in Light of the Ud-
 stad '020 Patent, the Wagner '031 Patent, and the Mil-
 ler '399 Patent? ...............................566
 (2) Did the Patent Examiner Consider Prior Art with Ele-
 ments Similar to Those Found in the Udstad '020 Patent,
 the Wagner '031 Patent, and the Miller '399 Patent?.....567
 d. Secondary Considerations .............................570
 4. Use of Expert Testimony and Animation/Illustrations .......571
 C. Enforceability .................................................572

II. Irreparable Harm ...............................................573

III. Balance of Hardships .............................................575

IV. Public Interest ..................................................576

V. The Bond to be Posted by NSC.......................................577

CONCLUSION ........................................................577

## INTRODUCTION

National Steel Car ("NSC"), a manufacturer of rail cars, is suing Canadian Pacific Railway ("CPR"), a Canadian railroad, and three affiliated companies for patent infringement. The accused product is a dropped deck center beam flat car that is used for hauling lumber. CPR has entered into a contract to purchase the accused rail cars from Greenbrier, one of NSC's competitors, for use in the United States. NSC claims that the accused rail cars infringe its United States Patent Number 4,951,575 ("the '575 Patent").

Before the Court is the plaintiff's motion for a preliminary injunction. The Court held an evidentiary hearing on December 11 and 12, 2002. CPR concedes that the asserted claim limitations of the '575 Patent read on the accused rail cars. CPR argues that it is not guilty of infringement, however, because the accused rail cars will be only temporarily in the United States. The defendants also claim that the '575 Patent is invalid because of anticipation and obviousness, and unenforceable because it was fraudulently revived. The Court finds that these defenses lack sub-stantial merit and will grant the preliminary injunction.

Pursuant to Federal Rule of Civil Procedure 52(a), the Court's findings of fact and conclusions of law are set forth below. For ease of reference, certain findings of fact, including findings relevant to the Court's invalidity analysis, are included under the appropriate headings in the Court's Conclusions of Law and Additional Findings of Fact section. Any other conclusion of law that should be construed as a finding of fact is hereby adopted as such.

## FINDINGS OF FACT

### I. The Parties

1. The plaintiff, National Steel Car, Ltd. ("NSC"), is a Canadian corporation that has manufactured railroad cars since 1912. It is a private corporation that employs approximately 800 people. Examples of some of the cars that NSC builds are flat cars, boxcars in various configurations, cargo cars, coil steel cars, and hopper cars in a number of different configurations. Tr. I, at 109, 111; Pl. Mot. Ex. B, at ¶¶ 14, 17.[1]

---

1. Hereinafter, the exhibits to the plaintiff's motion for a preliminary injunction will be labeled "Pl. Mot. Ex." followed by the exhibit letter and page number. The exhibits to the defendant's answer and opposition to the motion will be labeled "Def. Opp. Ex." followed by the exhibit number and page number. The exhibits to the plaintiff's reply brief will be labeled "Pl. Reply Ex." followed by the exhibit number and page number. References to the transcript from the portion of the evidentiary hearing held on this motion on Decem-ber 11, 2002 are indicated as "Tr. I" followed by the transcript's page number. References to the transcript from the portion of the evidentiary hearing held on this motion on December 12, 2002 are indicated as "Tr. II" followed by the transcript's page number. Exhibits introduced by the plaintiff at the evidentiary hearing are labeled "Pl. H'rg Ex." followed by a number. Exhibits introduced by the defendant at the evidentiary hearing are labeled "Def. H'rg Ex." followed by a number.

2. NSC sells its rail cars in North America. NSC sells rail cars to class one railroads such as Union Pacific, Burlington Northern, Fort Worth, CSX, and Norfolk Southern. NSC also sells rail cars' to a number of leasing companies such as TTX, GE Capital, GATX, CIT, and First Union. Additionally, NSC sells rail cars to Canadian railroads such as Canadian National Railway, CPR, and BC Rail. Tr. I, at 109–110.

3. Canadian Pacific Railway, Ltd., is a holding company. Canadian Pacific Railway Company conducts most of CPR's business. 3942503 Canada is a wholly owned subsidiary of CPR. The Delaware and Hudson Railway Company is a railway in the United States owned by Canadian Pacific Railway. Unless otherwise noted, "Canadian Pacific Railway" or "CPR" refers to all of the defendants collectively.

4. CPR owns rail lines in Canada. It owns and operates trains that run on these railroads. It does not manufacture rail cars. It buys rail cars for its trains from rail car manufacturers. In the past, it has been a large customer of NSC's. Pl. Mot. Ex. B, ¶ 5.

5. The Greenbrier Companies ("Greenbrier") is a United States company that makes rail cars. Greenbrier produces rail cars at its Gunderson facility in Portland, Oregon and its TrentonWorks facility in Nova Scotia, Canada. Greenbrier is a competitor of NSC's. Pl. Mot. Ex. B, at ¶ 2; Pl. Reply Ex. 16; Pl. Reply Ex. 42, at 2.

## II. *Issuance / Reissuance of the '575 Patent*

6. On August 28, 1990, Danilo A. Dominguez and James F. Flores were issued United States Patent No. 4,951,575 ("the '575 Patent"). This patent was for a depressed center beam flat car designed to haul large loads of lumber. Pl. Mot. Ex. A.

7. After being issued the patent, Mr. Dominguez and Mr. Flores attempted to commercialize it by marketing it to some rail car manufacturing companies including Gunderson. Def. Opp. Ex. 9, at 164; Def. Opp. Ex. 10, at 62.

8. Mr. Flores stopped his attempts to commercialize the '575 Patent between a year and a year and a half after the patent was issued. Mr. Dominguez ceased his attempts to commercialize the patent by 1993. Def. Opp. Ex. 10, at 189–90; Def. Opp. Ex. 10, at 63.

9. From 1992 to 2000, Mr. Dominguez ran a manufacturing facility in Texas. He was working six or seven days a week and up to sixteen hours a day dealing with customers, employees, and the government. Def. Opp. Ex. 9, at 128.

10. In 1994, Mr. Dominguez paid a fee to the Patent and Trademark Office as required by law to maintain the '575 Patent. He knew that if he did not pay the fees, then the patent would expire. Def. Opp. Ex. 9, at 98–99, 111–12.

11. Mr. Flores had given Mr. Dominguez the authority to make a decision on whether or not to pay the maintenance fees for the '575 Patent. Mr. Flores believed that Mr. Dominguez was paying the required maintenance fees. Def. Opp. Ex. 10, at 75–76.

12. In letters dated August 19, 1997 and January 20, 1998, Mr. Dominguez's attorney, Edward Gilhooly, sent letters to Mr. Dominguez reminding him that another maintenance fee was due in August 1998. Def. Opp. Ex. 18.

13. The '575 Patent lapsed on August 28, 1998 after neither Mr. Dominguez nor Mr. Flores paid the maintenance fee that was due. The failure to pay the fee was unintentional. At the time the fee was due, Mr. Dominguez was busy running his manufacturing facility in Texas. Mr.

Dominguez forgot all about the '575 Patent at the time the maintenance fee was due because of how busy he was running his manufacturing facility. Mr. Flores did not pay the maintenance fee that was due because he had given Mr. Dominguez the responsibility to pay the maintenance fee, and he assumed that Mr. Dominguez had paid the maintenance fee. Def. Opp. Ex. 9, at 128, 137, 147; Def. Opp. Ex. 10, at 75–76.

14. In early 2000, Neil Smith, an attorney for NSC, contacted Mr. Dominguez and Mr. Flores to inquire about the '575 Patent. Mr. Smith negotiated with Mr. Dominguez and Mr. Flores to obtain the '575 Patent for NSC. Pl. Reply Ex. 4, at 7–8, 11, 16.

15. During the negotiations with NSC for the sale of the '575 Patent, Mr. Flores told Mr. Smith that he did not intend to let the '575 Patent lapse. He thought that Mr. Dominguez had paid any maintenance fees that were required. He first learned that the maintenance fee had not been paid when Mr. Smith told him about it. Mr. Flores was surprised when Mr. Smith told him the maintenance fee had not been paid. Pl. Reply Ex. 4, at 11, 15; Pl. Reply Ex. 5, at 75, 148, 151.

16. Mr. Dominguez told Mr. Smith that he had not intended to let the patent lapse for failure to pay the maintenance fees. Pl. Reply Ex. 4, at 16; Def. Opp. Ex. 12, at 31–32.

17. On February 29, 2000, Mr. Smith sent a letter to Mr. Dominguez and Mr. Flores outlining the agreement for NSC to acquire the rights to the '575 Patent. In Mr. Smith's letter, he wrote "that [Mr. Dominguez and Mr. Flores] did not intend to let the '575 Patent expire for failure to pay the maintenance fee". Pl. Reply Ex. 29.

18. NSC bought the '575 Patent in March of 2000 for [Redacted] with [Redacted] to each inventor. NSC promised another [Redacted] to each inventor if NSC was able to reinstate the '575 Patent. Tr. I, at 112; Def. Opp. Ex. 16.

19. On March 31, 2000, George Limbach, Mr. Smith's partner, filed with the Patent and Trademark Office ("the PTO") a petition to revive the patent. This petition stated that "the delay in payment of the maintenance fee was unintentional." Pl. Reply Ex. 30, at NSC 000262.

20. The PTO reinstated the '575 Patent on May 1, 2000. Pl. Reply Ex. 30, at NSC000266.

III. *Dropped Deck Center Beam Flat Cars*

21. At the time that the '575 Patent was obtained, most lumber and construction material was transported in center beam or center partition rail cars. Materials transported on these cars was generally bundled in equal length pieces. A standard 100 ton center beam car could carry between 194,000 to 200,000 pounds. The weight of typical loads of lumber carried on fully loaded cars was approximately 170,000 pounds. The result was that the cars were carrying between 85% and 87.6% of the weight that the cars could. Pl. Mot. Ex. A, at 1.

22. The standard center beam cars in existence at the time of the '575 Patent was invented had a center of gravity of ninety-six inches loaded and fifty-six inches empty. The high center of gravity presented certain problems with stability. Materials loaded onto the cars needed to be placed in such a way that the weight was evenly distributed on both sides of the center beam. Unbalanced loads had the potential to tip over the car. Pl. Mot. Ex. A., at 1.

23. The '575 Patent refers to its car as a "depressed center beam flat car." This

is the same car as a "dropped deck center beam flat car." *See* Pl. Mot. Ex. A.

24. A dropped deck center beam flat car has an intermediate section between the front and back wheels that is lower than the end sections. These types of cars can haul loads that might otherwise present clearance problems on a basic flat car. Additionally, for a given clearance, a depressed center car can haul a load of greater volume than a regular flat car. Before 1989, designers of these cars used a sloping design in the transition area between the two levels. Def. Opp. Ex. 1, ¶ 12; Pl. Reply Ex. 1, ¶ 5. 25.

25. NSC has built a prototype of the car that is the commercial embodiment of the '575 Patent. The prototype is the NSCX 2011. This car has been displayed and discussed in presentations including presentations done for CPR. The prototype is for the dropped deck center beam flat car offered by NSC to CPR. Tr. I, at 116–17; Pl. H'rg Ex. 2; Pl. Mot. Ex. B, at ¶¶ 3–4.

26. Greenbrier's version of a dropped deck center beam flat car is the GBRX 20003. This is the dropped deck center beam rail car that Greenbrier sold to CPR. Pl. Mot. Ex. B, at ¶ 12.

IV. *CPR's Purchase of Dropped Deck Center Beam Cars*

27. In 1999, CPR began a program of fleet renewal for its center beam flat cars. As part of a fleet renewal plan, CPR decided which part of its fleet to replace and what new cars to acquire. Tr. I, at 205.

28. As part of the fleet renewal for center beam cars, CPR discussed with its largest customers the customers' needs. CPR's two top customers, Canfor and Weyerhauser, told CPR that the two primary needs in new cars were: (1) to ensure that the product and the packaging around the product being shipped arrived at its destination in the same condition as it was when it left its origin and (2) to ensure that the cars allowed the people who loaded the cars to do their job safely. Canfor and Weyerhauser are two large lumber shippers. Tr. I, at 206.

29. By early 2000, rail car manufacturers had started making prototypes of dropped deck center beam cars to show to CPR. This allowed CPR to develop and refine its eventual request for quote regarding new rail cars. It also gave CPR the opportunity to ask the potential suppliers to make changes to their designs. Def. Opp. Ex. 6, at ¶¶ 6–10.

30. Four rail car manufacturers—Greenbrier, NSC, Trinity Rail Market Services, and Alstom Transport—each developed and built prototypes of dropped deck center beam cars. A fifth rail car manufacturer, Johnstown America Corporation, declined to build a prototype. It relied on a non-dropped deck center beam car that it had built with Burlington Northern Railway. Tr. I, at 208–09; Tr. II, at 9; Def. Opp. Ex. 6, at ¶¶ 6–10.

31. Trinity showed CPR its prototype for a depressed deck car in the summer of 2000. Greenbrier showed CPR its prototype later that year. NSC showed CPR its prototype sometime after Greenbrier. Alstom was the last company to show CPR its prototype. Tr. I, at 209; Tr. II, at 9; Def. Opp. Ex. 6, at ¶ 9.

32. On July 28, 2000, NSC sent letters to Thrall Car Manufacturing Company and Johnstown America Corporation. On August 7, 2000, NSC wrote to Gunderson. The letters were written by George Limbach, an attorney for NSC. These letters stated that NSC was "writing this letter enclosing a copy of the '575 Patent to make certain [they were] aware of its existence and its ownership by National Steel Car, Inc." Tr. I, at 113–15; Pl. H'rg Ex. 1; Pl. Reply Ex. 31; Pl. Reply Ex. 7, at 36–37.

33. Near the beginning of 2001, Greenbrier's prototype made a trip to Hamilton, Ontario after being loaded with lumber in Edmonton, Alberta. This prototype, loaded with lumber, entered the United States sometime after the trip to Hamilton. Tr. I, at 210–11.

34. On April 3, 2001, Todd Pafford, a member of CPR's marketing staff, sent CPR an email in response to a request from CPR's purchasing department for budget pricing on three types of center beam cars including the dropped deck center beam car. In the email, Mr. Pafford wrote that NSC held the exclusive patent rights to the dropped deck center beam car. Tr. I, at 117–18; Pl. Reply Ex. 45.

35. On December 13, 2001, NSC's then-President, John S. Marinucci, sent a letter to William A. Furman, President of Greenbrier and L. Clark Wood, President of Manufacturing at Gunderson. NSC had learned that Gunderson was manufacturing a depressed center beam car, the GBRX 20003, that would be sold by Greenbrier. In the letter, Mr. Marinucci stated "that Gunderson and Greenbrier might wish to obtain a license to manufacture, use, sell, and offer to sell depressed center beam flat cars under one or more of the claims of the '575 Patent." Def. Opp. Ex. 13; Def. Opp. Ex. 7, at 32–33; Tr. 115–16.

36. Mr. Wood replied to Mr. Marinucci's letter on December 20, 2001 saying that the patent had been examined and there was no need to obtain a license. Def. Opp. Ex. 13.

37. There were no internal discussions at NSC about licensing the '575 Patent to Greenbrier nor was there any licensing discussions between NSC and Greenbrier. Tr. I, at 115–16; Pl. Reply Ex. 7, at 36–38.

38. NSC has a policy not to license its patents. It uses its patents to market its products. NSC has never licensed any of its patents, including the '575 Patent, to any other company or individual. Tr. I, at 116; Pl. Reply Ex. 7, at 36–38.

39. On May 21, 2002, CPR issued a Request for Quote ("RFQ") for an order of 875 depressed center beam flat cars. Pl. Mot. Ex. B, at ¶ 6. Greenbrier, NSC, and Trinity, submitted bids. Tr. I, at 208, 212, 220; Pl. Mot. Ex. B, at ¶ 7; Def. Opp. Ex. 6, at ¶¶ 12, 14; Pl. Reply Ex. 36.

40. On May 23, 2002, NSC made a presentation to CPR regarding its NSCX 2011 depressed center beam flat car, the physical embodiment of the '575 Patent. During this presentation, NSC showed CPR a copy of the '575 Patent. NSC had informed CPR of the '575 Patent in prior meetings. NSC told CPR of NSC's patent rights and informed CPR that it intended to protect those rights. Tr. I, at 117–22; Pl H'rg Ex. 3, at NSC000428–NSC000429; Pl. Mot. Ex. B, at ¶¶ 9–10.

41. Greenbrier, Trinity, and NSC submitted their first bids on the RFQ by June 12, 2002. These three suppliers made presentations to CPR on June 17 and 18, 2002. Then, each company submitted a second bid to CPR by June 26, 2002. Next, each company submitted a third bid to NSC before July 8, 2002. Def. Opp. Ex. 6, at ¶¶ 15–16. [Redacted]

43. On July 8, 2002, Hugh Nicholson, NSC's Managing Director of Marketing and Sales, sent CPR a letter in response to questions CPR had raised in a July 4, 2002 conference call. In this letter, NSC offered to indemnify CPR in any patent infringement suit related to dropped deck center beam cars if CPR awarded the contract to build dropped deck center beam cars to NSC. NSC also informed CPR that NSC held the '575 Patent, and it was prepared to protect its interest in the '575 Patent with whatever legal means necessary. Tr. I, at 121; Pl. H'rg Ex. 4, at 2.

44. By July 10, 2002, three rounds of bidding were completed with respect to CPR's Request for Quote. [Redacted]

45. The third round was the last round of bidding in which NSC was allowed to participate. Taking into account an estimate of cost component savings, CPR calculated the total net cost of each car after the third round bid as [Redacted] if [Redacted] Greenbrier manufactured the cars and [Redacted] if NSC manufactured the cars. [Redacted] Tr. I, at 226–27; Pl. Reply Ex. 36.

46. CPR's Request for Quote requested information other than the price of the car. It requested a warranty that was broader than the warranty asked for by CPR in prior deals. NSC offered CPR a warranty that was broader than NSC's standard warranty but not as broad the one requested by CPR. Tr. I, 122–23; Pl. Reply Ex. 7, at 170–71, 183; Pl. Reply Ex. 8, at 129.

47. Another factor in the RFQ was the weight of the rail cars. The maximum weight specified in the RFQ was 64,000 pounds. NSC's offered car was 65,700 pounds. NSC's engineers believed that CPR's targeted weight was not realistic and would compromise the integrity of the design. NSC never stated that it did not have the ability to provide a car to the weight specification that CPR desired. CPR informed NSC of the problems with the weight of the car that NSC submitted in the third round of bidding when CPR told NSC that it was not receiving the bid. Tr. I, at 123–25, 218, 224; Pl. Reply Ex. 7, at 183; Pl. Reply Ex. 8, at 152; Pl. Reply Ex. 37, at NSC000290.

48. NSC was excluded from the fourth round of bidding which was also the last round of bidding. NSC could not submit a revised bid without an express date set by CPR. There was no date or opportunity given to NSC by CPR to allow NSC to revise its third round bid. Pl. Reply Ex. 8, at 131, 220–21.

49. On July 29, 2002, CPR informed NSC that its bid had not been accepted. CPR awarded the contract to Greenbrier and is buying Greenbrier's GBRX 20003. After losing the bid, an NSC executive met with a CPR executive to inform CPR that NSC believed Greenbrier's flat car infringed the '575 Patent. Tr. I, at 223; Pl. Mot. Ex. B, at ¶¶ 11–13.

50. In CPR's final rankings, Greenbrier won the bid, Trinity was second, and NSC was third. Tr. I, at 223.

51. In September 2002, CPR and Greenbrier entered into a purchase agreement. The contract for the purchase of the dropped deck center, beam flat cars is between TrentonWorks and 3942503 Canada. The Greenbrier Companies guaranteed the performance of the obligations TrentonWorks has under the contract. CPR guaranteed the performance of the obligations that 3942503 Canada has under the contract. (For convenience, the Court refers to Greenbrier and CPR in discussing the contract instead of TrentonWorks and 3942503 Canada.) Pl. Reply. Ex. 16, at CP003435, CP003445–CP003446.

52. Under this agreement, Greenbrier agreed to construct depressed center beam rail cars and CPR agreed to purchase 525 of these rail cars from Greenbrier. The rail cars being purchased are the GBRX 20003. The cars are being manufactured in Canada at Greenbrier's TrentonWorks facility. Tr. I, at 229; Pl. Reply Ex. 16, at CP003435–CP003436; Pl. Mot. Ex. B, at ¶ 11.

53. The rail cars subject to the agreement between Greenbrier and CPR are seventy-three foot bulkhead flat cars with center partitions and depressed center lading decks. The cars weigh 64,000 pounds unloaded and are designed for a gross load

of 286,000 pounds. Pl. Reply Ex. 16, at CP003435, CP003450, CP003451.

54. [Redacted]

## V. *Greenbrier's Indemnification of CPR*

55. [Redacted]

56. [Redacted]

57. [Redacted]

58. [Redacted]

59. [Redacted]

## VI. *CPR's Use of Dropped Deck Center Beam Cars*

60. CPR currently has a fleet of seventy-three foot center beam flat cars. There are 2,900 of these cars in the fleet. Approximately, 2,300 of these cars are leased by CPR to other companies. Approximately, 600 of the cars are owned by companies who ship goods with CPR. Tr. I, at 230; Tr. II, at 10.

61. CPR owns some rail lines in the United States, but it does not own rail lines serving all destinations in the United States. To serve certain United States destinations, CPR partners with railway companies in the United States. CPR's cars are switched to United States railroads at interchange points. An example of an interchange point is Chicago, IL. Tr. II, at 5–6; Pl. Reply Ex. 2, at 50–51, 53–54, 96–97, 228–230; Pl. Reply Ex. 9.

62. When the cars reach interchanges, the cars may end up on different trains headed to different destinations. When the cars reach an interchange point, the cars are handed over to another railroad company, and the cars are connected to locomotives owned by other companies. Tr. II, at 13–21; Pl. H'rg Ex. 6.

63. When the interchange point is in the United States, the locomotive that pulls the cars after the cars leave the interchange point are owned by United States companies. The CPR locomotive does not continue past the interchange point when CPR does not own the track leaving the interchange point Tr. II, at 13–21; Pl. H'rg Ex. 6.

64. CPR intends to use the GBRX 20003 cars that it is buying from Greenbrier in exactly the same way as it uses its current fleet of lumber carrying cars. Center beam cars are rarely used to ship anything other than lumber. Tr. I, at 231–32; Tr. II, at 35; Pl. Reply Ex. 2, at 245.

65. In 2001 and the first six months of this year, CPR's current fleet of lumber carrying cars delivered Canadian lumber to the United States and returned empty to Canada 99.2% of the time. Tr. I, at 234–37; Def. Hr'g Ex. PX 33; Def. Hr'g Ex. PX 34.

66. On the basis of miles, a center beam car in CPR's fleet spends 43% of its time in Canada and 57% of its time in the United States. Tr. I, at 250.

67. On the basis of days, a center beam car in CPR's fleet spends 44% of its time in Canada and 56% of its time in the United States. Tr. I, at 250.

68. CPR identified two reasons why the use statistics for the dropped deck center beam cars may be different than the use statistics for the current center beam cars. First, the current cars are all leased, and the lease agreements generally require the lessors to perform maintenance on the cars. Should CPR own the new cars, it will want to perform maintenance in its system. Second, depending on demand, the cars may have some down time where the cars will be stored in Canada. Currently, demand has met or exceeded supply resulting in no storage. If there is a point where supply exceeds demand, then there will be a need for storage. Tr. I, at 251–52; Tr. II, at 36.

69. [Redacted] percent of CPR's lumber shipping involves either a trip between a Canadian and United States destination

or between two United States destinations. [Redacted]

70. [Redacted]

71. The [Redacted] dropped deck center beam cars are [Redacted] more than the [Redacted] cars of any type that CPR needs to make its deliveries of lumber between Canadian destinations. CPR will not receive at least [Redacted] of the dropped deck center beam cars until [Redacted] Tr. II, at 44; Pl. Reply Ex. 16, at CP003470.

72. [Redacted]

73. CPR's contracts with Canfor and Weyerhauser call for CPR to purchase dropped deck center beam flat cars and not standard center beam flat cars. Tr. II, at 11.

74. [Redacted]

75. Canfor and Weyerhaeuser intend to purchase additional dropped deck center beam cars from Greenbrier for use by CPR to serve the lumber shippers' customers. Pl. Reply Ex. 2, at 246; Pl. Reply Ex. 14 at CP002015; Pl. reply Ex. 42, at 2.

76. Exported Canadian lumber supplies 30% of the need for lumber in the United States. There is not a need for American lumber to be shipped into Canada. Tr. I, at 230–31.

77. When the center beam cars are used to ship lumber, the cars are on trains with other cars shipping other commodities. Generally, there is one car or a few cars carrying lumber on a train. The lumber cars are on trains with other cars that all are going to different destinations. Tr. II, at 13–21; Pl. H'rg Ex. 6.

78. Rail car owners are entitled to a depreciation allowance under United States tax laws. The depreciation is allowed at certain rates called MACRS. The depreciation benefits are available if the cars are used predominantly inside of the United States. Tr. II, at 30–31; 26

U.S.C. § 168(g); Pl. Reply Ex. 3, at 203–04.

79. CPR pays taxes in the United States. It earns revenue in the United States. It also owns railways in the United States. Tr. II, at 30; Pl. Reply Ex. 2, at 155–56, 370–71; Pl. Reply Ex. 9.

80. [Redacted]

81. [Redacted]

82. Greenbrier has offered for sale and sold the GBRX 20003 cars to Weyerhauser, Canfor, and TTX. Weyerhauser is a United States company. TTX is a large leasing company based in Chicago, Illinois. Pl. Reply Ex. 3, at 159; Pl. Reply Ex. 13, at GB006804, GB000139.

## VII. *Ownership of Dropped Deck Center Beam Cars*

83. CPR does not own any of the standard seventy-three foot center beam cars that it currently uses. All of these cars are leased. Tr. I, at 230.

84. No decision has been made about the ownership structure of the dropped deck center beam flat cars. There are three options for CPR in terms of ownership of the dropped deck center beam flat cars: (1) CPR could own the cars outright; (2) CPR could have a capital lease where the lessor puts up the amount to buy the car initially and then CPR repays both the principal and interest; or (3) CPR could have a longer term operating lease. Tr. II, at 37–39.

## VIII. *CPR's Receipt of the Accused Rail Cars*

85. The delivery schedule for the rail cars as provided in the agreement required Greenbrier to deliver: [Redacted]

86. The cumulative number of cars that 3942503 Canada would have received under this contract by the week of: [Redacted]

## IX. *Impact on NSC of Not Receiving the CPR Contract*

87. There are three major manufacturers of rail cars in North America: Trinity–Thrall Industries; The Greenbrier Companies; and NSC. Pl. Mot. Ex. B, at ¶ 14.

88. In the past few years, there has been high demand for rail cars. In these years, total sales for rail car manufacturers ranged from 60,000 to 80,000 rail cars per year. Pl. Mot. Ex. B, at ¶ 15.

89. Recent orders for rail cars have been lower. Industry analysts have forecasted that about 21,000 railroad cars will be sold in 2002 and 33,000 cars in 2003. Pl. Mot. Ex. B, at ¶ 16.

90. NSC does not make certain types of rail cars. Because of this, it is only able to compete for 11,000 of the rail cars to be sold in 2002 and 16,000 of the rail cars to be sold in 2003. Pl. Mot. Ex. B, at ¶ 17.

91. The market share for Trinity–Thrall Industries is a majority of the market. Pl. Mot. Ex. B, at ¶ 14.

92. NSC's market share for the year 2002 is 12%, and NSC built [Redacted] rail cars in 2002. It projected that it would have a market share of 20% for 2002. NSC has also projected a 20% market share for 2003. Tr. I, at 128–129; Pl. Reply Ex. 7, at 84; Pl. Reply Ex. 40, at NSC004779.

93. Greenbrier has a 38% market share for the year 2002. Greenbrier also has a 5,000 plus backlog of cars. In a press release dated October 28, 2002, Greenbrier attributed part of its success to receiving orders from CPR and Canfor for GBRX 20003 cars. Pl. Reply Ex. 42, at 2.

94. Greenbrier's October 28, 2002 press release states that the GBRX 20003 is the first commercially available center partition car to have a depressed floor. Greenbrier also mentioned in the press release that it was the first company to receive orders for this type of rail car and that its design is superior to other alternatives available in the market. Pl. Reply Ex. 42, at 2.

95. NSC factored being awarded the bid from CPR for the dropped deck center beam flat cars into its market forecast. Tr. I, at 126.

96. NSC was attempting to be the first to market with the dropped deck center beam flat car. Being the first to market would give NSC product recognition, product innovation, and association with the dropped deck center beam flat car. Tr. 1, at 126–27.

97. NSC has received orders for other cars since losing the bid for the dropped deck center beam cars. The orders have been for box cars and well cars. None of the orders are for dropped deck center beam flat cars. Tr. I, at 127–28, 132.

98. The largest order that NSC has received since losing the NSC bid was for 500 cars. Tr. I, at 128.

99. Rail car manufacturers use the term "backlog" as a measure of financial health and future stability of the company. Backlog is the orders that a company has pending less the cars that are shipped. As cars are shipped, the backlog decreases. As orders are received, backlog increases. NSC's current backlog is 1,640 cars. Tr. I, at 129.

100. At the time the bid was awarded, NSC had a backlog of 642 cars. Using that number, the bid would have increased NSC's backlog by 140%. From NSC's current backlog, the bid would increase NSC's backlog by approximately 50%. Tr. I, at 130.

101. NSC's current lines include a line building eighty-nine foot flat cars, a line building [Redacted] well car units, and a line building approximately [Redacted] box cars. NSC has also received an additional order from TTX for 500 intermodal double

stacked cars. Tr. I, at 157–59, 162; Pl. Hr'g Ex. 5.

102. The number of employees needed by NSC varies from week to week depending on what rail car orders are being filled and how many rail cars are being produced in a given week for that order. Pl. H'rg Ex. 5; Pl. Reply Ex. 40.

103. NSC has prepared projections on September 17, 2002 and October 24, 2002 of its weekly labor requirements for the time period from the week of November 8, 2002 to June 9, 2003. This is the time period in which NSC would have been building dropped deck center beam cars if it had received CPR's order for these cars. Tr. I, at 130–33; Pl. H'rg Ex. 5; Pl. Reply Ex. 40.

104. The September 17, 2002 projection included the labor requirements for a line building [Redacted] Tr. I, at 130–33; Pl. Reply Ex. 40.

105. The October 24, 2002 projection reflects the labor requirements included in the September 17, 2002 projection. It also includes the labor requirements for an order of [Redacted] that was not reflected in the September 17, 2002 projection. Tr. I, at 130–33; Pl. H'rg Ex. 5; Pl. Reply Ex. 40.

106. The October 24, 2002 projection also includes the labor it would have required if it had received CPR's order for dropped deck center beam cars. NSC calculated the number of employees needed for CPR's order based on the order being for 875 dropped deck center beam flat cars. The projection does not include the labor requirements for the order NSC received from TTX for 500 intermodal double stacked cars. Tr. I, at 130–33, 157–59; Pl. H'rg Ex. 5; Pl. Reply Ex. 40.

107. Using the October 24, 2002 projection, the weekly labor requirement for NSC's other three lines building rail cars ranges anywhere between [Redacted] employees during the time that NSC would have built the dropped deck center beam cars. The exact number of employees needed depends on how many of the lines would be operating in a given week and how many rail cars each line was to produce in a given week. Tr. I, at 130–33; Pl. H'rg Ex. 5.

108. The weekly labor requirement for NSC's dropped deck center beam line would have ranged anywhere between [Redacted] employees depending on how many dropped deck center beam cars were to be produced in a given week. Tr. I, at 130–33; Pl. H'rg Ex. 5.

109. The different lines building rail cars at NSC share certain services. If NSC was building dropped deck center beam cars, the projections for how many total employees it would need to build all of its rail car lines would take into account that some employees were performing services shared by all of NSC's rail car lines. Tr. I, at 131–32.

110. Using the October 24, 2002 projection, the difference in NSC's weekly labor requirements during the time it would have built the dropped deck center beam cars ranges from [Redacted] employees. Tr. I, at 130–133; Pl. Hr'g Ex. 5.

X. '575 Patent

A. Overview

111. The '575 Patent is for a railway flat car that has a depressed load carrying portion to reduce the center of gravity of the car. The flat car has a side sill assembly with an upper end section that has floor portions and a lower intermediate section for supporting the depressed load carrying portion. The depressed portion has an overall width that is less than the upper floor portions. The car also has an intermediate longitudinal center sill merging with the end draft sills. These end

draft sills have a larger width than the center sill. Pl. Mot. Ex. A.

112. The preferred embodiment is for a depressed center beam flat car supported by a pair of truck assemblies and with a center beam assembly. The center beam assembly extends along the car's longitudinal centerline above a longitudinally extending center sill having an upper surface. There is a bulkhead assembly mounted on each end of the car above the draft sill assembly. Pl. Mot. Ex. A, at 3, 5.

113. The depressed floor section in the preferred embodiment may be approximately 75% of the between bulkhead length of the car. The depressed floor section lowers the center of gravity of the car, and this improves stability. Pl. Mot. Ex. A, at 4.

114. The depressed floor section comprises a plurality of floor sheets. These sheets are supported by a plurality of spaced cross bearer assemblies. The floor sheets carry a plurality of upper tapered pieces on which the commodity to be transported may be arranged. Pl. Mot. Ex. A, at 4.

115. The depressed floor section's reduced overall width as compared to the width of the upper floor sheets allows commodities of standard width to be carried on the depressed floor and comply with regulations requiring clearance. The reduced width is due to the reduced horizontal width of the center sill as compared to the draft sills. Pl. Mot. Ex. A, at 4–5.

116. There is a side sill transition assembly in the preferred embodiment that includes a welded vertical side sill tie plate having an affixed triangular shaped transition tie plate gusset disposed under the upper side sill sections. Pl. Mot. Ex. A, at 4.

117. The side sill transition assembly maintains the structural integrity between upper side sill end sections and the depressed side sill sections. Pl. Mot. Ex. A, at 4.

118. End sections of the side sill assemblies are oriented on an axis vertically above the longitudinal axis of the intermediate side sill section. The longitudinal axis of the intermediate side sill section is laterally spaced inward toward center sill by a distance less than the axis of end side sill sections. Pl. Mot. Ex. A, at 4.

### B. *Claims*

119. NSC asserts that the GBRX 20003 infringes, both literally and under the doctrine of equivalents, claims 1, 2, 3, 5, 6, 7, 8, 9, 20, 21, 22, and 23 of the '575 Patent (the "asserted claims"). The asserted claims read as follows:

1. A flat car supported on end truck assemblies comprising:

a body formed by a longitudinally extending center sill, a draft sill attached to each end of said center sill, and a pair of bulkheads mounted at each end,

side sill means disposed on opposite sides of said center sill on said body,

a vertical center beam assembly extending upward from said center sill,

said vertical center beam assembly including an upper center sill extending parallel above said center sill between said bulkheads, said upper center sill being supported by a plurality of columns carried by at least said center sill, and

floor means being arranged between said opposite side sill means, said floor means having end floor sections lying in a first generally horizontal plane and an intermediate depressed floor section disposed in a second generally horizontal plane lying below said first horizontal plane,

said side sill means includes a pair of side sill assemblies disposed on opposite

sides of said center sill, each of said side sill assemblies includes a pair of upper end sections extending along an upper axis for respectively supporting said end floor sections and an intermediate section extending along a lower axis disposed below said first axis for supporting said intermediate depressed floor section.

2. A flat car supported on end truck assemblies comprising:

a body formed by a longitudinally extending center sill, a draft sill attached to each end of said center sill, and a pair of bulkheads mounted at each end,

side sill means disposed on opposite sides of said center sill on said body,

a vertical center beam assembly extending upward from said center sill,

said vertical center beam assembly including an upper center sill extending parallel above said center sill between said bulkheads, said upper center sill being supported by a plurality of columns carried at least said center sill, and floor means being arranged between said opposite side sill means, said floor means having end floor sections lying in a first generally horizontal plane and an intermediate depressed floor disposed in a second generally horizontal plane lying below said first horizontal plane,

a plurality of cross bearer members extending between said side sill means on said opposite sides of said center beam, said cross bearer members acting to support said intermediate depressed floor section, and

said plurality of cross bearer members are supported beneath said center sill.

3. The flat car according to claim 1 wherein said lower axis extends parallel to said center sill, said end section of said side sill assemblies respectively being disposed along said upper axis in parallel relationship to said lower axis.

5. The flat car according to claim 1 wherein said side sill means includes side sill transition means for joining said end sections of each of said side sill assemblies to said intermediate section.

6. The flat car according to claim 5 wherein said side sill means includes side sill transition means for joining said end sections of each of said side sill assemblies to said intermediate section.

7. The flat car according to claim 6 wherein said pair of vertical members comprise a pair of vertical plates having a surface affixed to said end sill sections and a surface affixed to said intermediate section.

8. The flat car according to claim 1 further comprising a plurality of cross bearer members extending between said side sill means on said opposite sides of said center beam, said cross bearer members acting to support said intermediate depressed floor section.

9. The flat car according to claim 8 wherein said plurality of cross bearer members are supported beneath said center sill.

20. A flat car supported on truck assemblies and having vertical column assemblies comprising:

a body formed by a longitudinally extending center sill, a draft sill mounted at each end of said center sill, and a pair of bulkheads disposed above said draft sills,

a pair of upper floor sections being respectively carried on said body adjacent said bulkheads and having upper surfaces lying in a first plane,

an intermediate floor section carried by said body and extending between said pair of upper floor sections, said intermediate floor section forming an upper surface lying in a plane disposed below said first plane,

said upper floor sections are symmetrically arranged adjacent said center sill, and

said 'intermediate floor' section is disposed below said center sill.

21. The flat car according to claim 20 further comprising a plurality of cross members carried by said center sill, a pair of side sill assemblies attached to said cross members on opposite sides of said center sill.

22. The flat car according to claim 20 wherein said intermediate floor section is carried by said cross members.

23. The flat car according to claim 1 wherein said upper end sections have a U-shaped cross sectional configuration. Pl. Mot. Ex. A, at 5–6, 8.

C. *Prosecution History*

120. On June 9, 1989, while the prosecution of the '575 Patent was ongoing, Mr. Dominguez and Mr. Flores cited prior art in an Information Disclosure Statement they submitted to the PTO. With this statement, the inventors submitted a copy of the patents they cited in the Information Disclosure Statement. These patents were:

(1) United States Patent Number 3,713,400 issued on January 30, 1973 ("Teoli '400 Patent");

(2) United States Patent Number 3,814,028 issued on June 4, 1974 ("Adler '028 Patent");

(3) United States Patent Number 3,841,236 issued on October 15, 1974 ("Hammonds '236 Patent");

(4) United States Patent Number 4,024,821 issued on May 24, 1977 ("Yang '821 Patent");

(5) United States Patent Number 4,079,676 issued on March 21, 1978 ("Miller '676 Patent");

(6) United States Patent Number 4,236,459 issued on December 2, 1980 ("Teoli '459 Patent");

(7) United States Patent Number 4,254,714 issued on March 10, 1981 ("Heap '714 Patent")

(8) United States Patent Number 4,331,083 issued on May 25, 1982 ("Landregan '083 Patent");

(9) United States Patent Number 4,361,097 issued on November 30, 1982 ("Jones '097 Patent"); and

(10) United States Patent Number 4,408,542 issued on October 11, 1983 ("Heap '542 Patent");

Pl. H'rg Ex. 7, at NSC000223–NSC000225; Pl. Reply Ex. 20, at NSC000223–NSC000225.

121. The Information Disclosure Statement also includes what Mr. Dominguez and Mr. Flores believed to be the teachings of the referenced patents. Pl. Reply Ex. 20, at NSC000223–NSC000225.

122. Two of the patent references cited in the Information Disclosure Statement were for flat cars. Other types of cars in the patent references cited in the Information Disclosure Statement were for a specialized boxcar, a mine car, and gondola cars. Tr. II, at 244–45.

123. The Adler '028 Patent was in front of the Patent Examiner. This car had a dropped center section and offset side sills. Tr. II, at 292–93; Pl. Mot. Ex. A.

124. The Adler '028 Patent refers to the Udstad patent: "Prior art railway vehicles which have included a depressed floor are illustrated by the U.S. Pat. No. 2,996,020 to S.F. Udstad which provides a vehicle with a depressed floor extending between the spaced trucks and extending on each side of a through center sill, the vehicle intended for the transport of automobiles vertically positioned in the car and attached to the pivotable side wall panels." Pl. Reply Ex. 1T, at 1.

125. The initial patent application filed by Mr. Dominguez was for a railway flat

car with a depressed load carrying portion to reduce the center of gravity of the car. The car included a side sill assembly having and upper end section with floor portions and a lower intermediate section to support the depressed load carrying portion. The depressed portion had an overall width less than the upper floor portions. The car also had an intermediate longitudinal center sill that merges with end draft sills having a larger width than the center sill. Pl. H'rg Ex. 6, at NSC000188.

126. On December 13, 1989, Mr. Dominguez's initial patent application was rejected. The reasons given by the examiner were that claims 23, 24, and 25 of Mr. Dominguez's initial patent application were clearly anticipated by the Baker '887 Patent and claims 1–8 and 15–17 of the initial patent application were rejected as being obvious from the Landregan '083 Patent in light of the Baker '887 Patent. Pl. H'rg Ex. 6, at NSC000228–NSC000229.

127. The Landregan '083 Patent did not include a vertical center beam extending longitudinally the length of the car. The Baker '887 Patent disclosed a center beam railroad freight car. Pl. H'rg Ex. 6, at NSC000229.

128. The Patent Examiner concluded that in light of the teachings of the Baker '887 Patent, it would have been obvious to a person of ordinary skill in the art to have put a vertical center beam that extended longitudinally the length of the car in the Landregan '083 Patent. Inserting this center beam would provide greater stability during loading and unloading and during transport of the load. Pl. H'rg Ex. 6, at NSC000229.

129. On March 13, 1990, Mr. Dominguez submitted an amended application for a patent for his rail car in response to the December 13, 1989 rejection. Pl. H'rg Ex. 6, at NSC000236.

130. In the remarks accompanying the amended application, Mr. Dominguez explained that the amended claim 1 was for a depressed floor section supported by intermediate side sill sections that extend along an axis below the upper sections. Pl. H'rg Ex. 6, at NSC000243.

131. Mr. Dominguez explained that the structure in the Landregan '083 Patent was not practical in the type of center beam car that was the subject of Mr. Dominguez's application because it could not provide the high strength characteristics possible in Mr. Dominguez's claimed invention. Pl. H'rg Ex. 6, at NSC000243.

132. The claimed invention used a continuous center sill and offset sections of side sills. The Landregan '083 Patent used a center sill dropped downward at its depressed center floor section and a continuous side sill. Pl. H'rg Ex. 6, at NSC000243.

133. Mr. Dominguez further explained that the depressed center sill section of the Landregan '083 Patent would not be satisfactory with a center beam because modifications would have to be made to the Landregan '083 Patent to provide adequate support for columns in which high strength was needed. Pl. H'rg Ex. 6, at NSC000243.

134. Additionally, columns in the Landregan '083 Patent would have to be lengthened to apply the teachings of a center column car like that in the claimed invention. Pl. H'rg Ex. 6, at NSC000243.

135. Mr. Dominguez explained that the Baker '887 Patent did not cure the shortcomings of the Landregan '083 Patent. The Baker '887 Patent showed a center beam car having a continuous center beam without a depressed floor section. The side sills in the Baker '887 Patent are continuous along a common axis. Pl. H'rg Ex. 6, at NSC000244.

136. In his remarks in the amended application, Mr. Dominguez stated that neither the Landregan '083 Patent nor the Baker '887 Patent make a suggestion of teaching how a continuous center sill could be combined with the car covered in the Landregan '083 Patent to produce the results of Mr. Dominguez's invention. Pl. H'rg Ex. 6, at NSC000244.

137. The amended application for a patent was allowed by the Patent Examiner on April 10, 1990. Pl. H'rg Ex. 6, at NSC000249.

138. The '575 Patent was issued on August 28, 1990. Pl. Mot. Ex. A.

139. In issuing the '575 Patent, the Patent Examiner cited to the following patents:

(1) United States Patent Number 3,713,400 issued in January 1973 ("Teoli '400 Patent");

(2) United States Patent Number 3,814,028 issued in June 1974 ("Adler '028 Patent");

(3) United States Patent Number 3,841,236 issued in October 1974 ("Hammonds '236 Patent");

(4) United States Patent Number 4,024,821 issued in May 1977 ("Yang '821 Patent");

(5) United States Patent Number 4,079,676 issued in March 1978 ("Miller '676 Patent");

(6) United States Patent Number 4,236,459 issued in December 1980 ("Teoli '459 Patent");

(7) United States Patent Number 4,254,714 issued in March 1981 ("Heap '714 Patent");

(8) United States Patent Number 4,331,083 issued in May 1982 ("Landregan '083 Patent");

(9) United States Patent Number 4,361,097 issued in November 1982 ("Jones '097 Patent");

(10) United States Patent Number 4,408,542 issued in October 1983 ("Heap '542 Patent");

(11) United States Patent Number 4,543,887 issued in October 1985 (Baker '887 Patent");

(12) United States Patent Number 4,681,041 issued in July 1987 ("Harris '041 Patent"); and

(13) United States Patent Number 4,753,175 issued in June 1988 ("Harris '175 Patent").

Pl. Mot. Ex. A.

140. The PTO examiner did not cite the Udstad '020 Patent, the Wagner '031 Patent, or the Miller '399 Patent when issuing the '575 Patent. Pl. Mot. Ex. A.

141. The Teoli '400 Patent, the Adler '028 Patent, the Hammonds '236 Patent, the Yang '831 Patent, the Miller '676 Patent, the Teoli '459 Patent, the Heap '714 Patent, the Landregan '083 Patent, the Jones '097 Patent, and the Heap '542 Patent were cited in both the Information Disclosure Statement provided by Mr. Dominguez and Mr. Flores and by the Patent Examiner in issuing the '575 Patent. Pl. Mot. Ex. A; Pl. Reply Ex. 20, at NSC000223–NSC000225.

142. The Jones '097 Patent and the Landregan '083 Patent, which were cited by the Examiner in issuing the '575 Patent, also cite the Miller '399 Patent. Pl. H'rg Ex. 7, at NSC000124, NSC000137.

XI. *Udstad '020 Patent*

143. United States Patent Number 2,996,020 (the "Udstad '020 Patent") was issued to Sigvald F. Udstad on August 15, 1961, and was assigned to ACF Industries, Incorporated. Pl. Reply Ex. 1D, at 1.

144. The patent was for a railway car that would transport automobile bodies or other large or heavy equipment. The railway car was a center sill carrying car that

had a roof directly supported by the center sill. Additionally, the extreme side of the underframe carries the weight of the lading. Means are provided for transmitting the weight of the lading to the center sill to relieve the underframe sides and to dissipate the torsion loads in the car frame through the center sill without overstraining the car. Pl. Reply Ex. 1D, at 1.

145. Additional features of the Udstad '020 Patent include longitudinal axes that are vertically oriented to utilize as much space as possible, roof and side wall protection against weather in a system allowing for easy access of the materials on board, a longitudinally disposed centrally positioned center sill girder structure, and cross ties connected at their ends by the side sills. The center sill girder structure extends upwardly to support the car roof and removable lading bearing side wall sections are provided. In the preferred embodiment of the invention, the center sill girder and low lying side sills transmit the lading load from the sides of the car to the center sill structure. This construction also alleviates longitudinal torsion loads in the underframe by directing the loads to the center sill structure. Pl. Reply Ex. 1D, at 1.

146. None of the claims of the Udstad '020 Patent use the terms: (1) flat car, (2) bulkhead, (3) center beam, (4) floor, or (5) side sill transition means. Pl. Reply Ex. 1D, at 5–8.

## XII. *Other Patents and Drawings*

Following are findings of fact with respect to certain patents and drawings: (1) cited in the '575 Patent; (2) cited in the Information Disclosure Statement that accompanied the application for the '575 Patent; or (3) relied upon by the parties.

### A. *Wagner '031 Patent*

147. United States Patent Number 3,734,031 (the "Wagner '031 Patent") was issued to Ross W. Wagner on May 22, 1973, and was assigned to the Thrall Car Manufacturing Company. Pl. Reply Ex. 1H.

148. This patent was for a center beam railroad car. The patent covered a car with a lightweight center sill and side sills, crossbearers supporting the floor, and a vertical center beam joined at its bottom to the center sill and extending longitudinally the length of the car between the bulkheads at each end of the car. Pl. Reply Ex. 1H.

149. In this car, the center beam has a top structure for aiding in transferring compressive forces between the bulkheads. The center beam's top structure also has a wide, mostly horizontal metal plate chord joined centrally to it and extending for the length of the top of the center beam. Pl. Reply Ex. 1H.

150. There is also a horizontal structural stiffening member joined to each edge of the wide chord and extending the length of the center beam. The stiffening members project upwardly to define opposing walls of a trough having the wide chord as a the bottom. The wide chord and stiffening members resist compressive and lateral forces applied to them. Pl. Reply Ex. 1H.

### B. *Adler '028 Patent*

151. United States Patent Number 3,814,028 (the "Adler '028 Patent") was issued to Franklin P. Adler on June 4, 1974, and was assigned to Pullman Transport Leasing Company. Pl. Reply Ex. 1T.

152. The patent was for a freight car with depressed center section. The patent covered a freight car having end doors that was adopted to carry large, bulky commodities. The car has a depressed center section extending between the spaced trucks. This permits the stacking

of large commodities which would ordinarily not be permissible because of restrictive car height limitations. The freight car also includes a trolley mounted car that permits rapid loading and unloading of cargo. Pl. Reply Ex. 1T.

153. The Adler '028 Patent is assigned to the same company, Pullman, as the Miller '399 Patent. The two patents are both from the mid–1970s. Pl. Reply Ex. 1T; Pl. Reply Ex. 1V.

154. In addition to other elements, the Adler '028 Patent discloses end truck assemblies, end walls, a center sill, upper floor sections, an intermediate depressed floor section, a transition section, multiple cross bearers, and side sills. These elements are in the Miller '399 Patent. Pl. Reply Ex. 1, at ¶ 55; Pl. Reply Ex. 1T; Pl. Reply Ex. 1V.

### C. *Miller '399 Patent*

155. United States Patent Number 3,964,399 (the "Miller '399 Patent") was issued on June 22, 1976 to Roy W. Miller, and was assigned to Pullman Incorporated. Pl. Reply Ex. 1V.

156. This patent was for a railway gondola car. The car included a depressed floor section. There were underframe cross members placed below the center sill. These cross members extended completely across the width of the car. The opposite ends of the gondola car are provided with elevated floors. The car includes a simplified and reinforced construction for minimizing structural damage to the car during operation. Pl. Reply Ex. 1V.

### D. *Yang '821 Patent*

157. United States Patent Number 4,024,821 (the "Yang '821 Patent") was issued on May 24, 1977 to Tunghan Yang, and was assigned to Pullman Incorporated. Pl. Reply Ex. 1R.

158. This patent was for "unit train coal car tension strips to prevent car body from twist." Pl. Reply Ex. 1R.

159. The patent covers a gondola type railway car that includes a pair of laterally crossed elongated braces. The braces couple the corner caps to the car floor. The braces extend downwardly and longitudinally inward and substantially across the car. The braces restrain lateral and longitudinal deflection of the car walls and thereby substantially reduce fatigue and fracture of the corner caps and walls. The braces effectively oppose the loads imposed upon the walls. The braces also do not obstruct the functionality of the car and do not materially encroach upon the usable space. Pl. Reply Ex. 1R.

160. The Yang '821 Patent is held by the same company, Pullman, as the Miller '399 Patent. The Yang '821 Patent was filed after the '399 Patent. Pl. Reply Ex. 1R; Pl. Reply Ex. 1V.

161. In addition to other elements, the Yang '821 Patent discloses end truck assemblies, end walls, a center sill, upper floor sections, an intermediate depressed floor section, a transition section, multiple cross bearers, and side sills. These same elements are in the Miller '399 Patent. Pl. Reply Ex. 1, at ¶ 54; Pl. Reply Ex. 1R; Pl. Reply Ex. 1V.

### E. *Miller '676 Patent*

162. United States Patent Number 4,079,676 (the "Miller '696 Patent") was issued to Roy W. Miller on March 21, 1978, and was assigned to Pullman Incorporated. Pl. Reply Ex. 1P.

163. The patent was for a freight car body reinforcement. This car is a high volume railway gondola car suited for high speed rail operations. It includes a pair of rigid elongated tension and compression braces at each end of the car. These

braces couple the corner caps of the car walls to the minimum vertical flexure portions of the car floor located immediately above the car center bearing assemblies. Pl. Reply Ex. 1P.

164. The Miller '676 Patent was invented by Roy Miller who also invented the Miller '399 Patent. Both patents are assigned to the same company—Pullman. The Miller '676 Patent was filed a year later than the '399 Patent. The Miller '676 Patent cites the Miller '399 Patent. Pl. Reply Ex. 1P; Pl. Reply Ex. 1V.

165. In addition to other elements, the Miller '676 Patent discloses end truck assemblies, end walls, a center sill, upper floor sections, an intermediate depressed floor section, a transition section, multiple cross bearers, and side sills. These elements are also disclosed in the Miller '399 Patent. Pl. Reply Ex. 1, at ¶¶ 52–53; Pl. Reply Ex. 1P; Pl. Reply Ex. 1V.

F. *Baker '887 Patent*

166. United States Patent Number 4,543,887 (the "Baker '887 Patent") was issued to William R. Baker on October 1, 1985, and was assigned to Thrall Manufacturing Company. Pl. Reply Ex. 1K.

167. This patent was for a center beam railroad freight car. This car included a body supported at each end by wheel containing trucks and a center beam extending longitudinally the length of the car between bulkheads at each end of the car. Pl. Reply Ex. 1K.

168. The center beam had a center sill, a top sill parallel to and spaced above the center sill, and a plurality of vertical spaced apart columns rigidly connected at their lower ends to the center sill and at their upper ends to the top sill. Pl. Reply Ex. 1K.

169. At each end of the car, there is a vertical plate extending from the center sill to the top sill and from the bulkhead at that end inwardly along the center sill.

The vertical plate is joined to the center sill, top sill, and bulkhead, and a plurality of the columns. Pl. Reply Ex. 1K.

170. The Baker '887 Patent is assigned to the same company, Thrall, as the Wagner '031 Patent. Both patents disclose the same features of a center beam flat car. The Baker '887 Patent was filed thirteen years after the Wagner '031 Patent. The Baker '887 Patent discloses a later generation of the same center flat beam car contained in the Wagner '031 Patent. Pl. Reply Ex. 1, at ¶¶ 44–45; Pl. Reply Ex. 1H; Pl. Reply Ex. 1K.

171. In addition to other elements, the Baker '887 Patent discloses end truck assemblies, bulkheads, a center sill, U-shaped side sills, a center beam, a floor, and multiple cross bearers. These elements are also disclosed in the Wagner '031 Patent. Pl. Reply Ex. 1, at ¶¶ 44–45; Pl. Reply Ex. 1H; Pl. Reply Ex. 1K.

G. *Harris '041 Patent*

172. United States Patent Number 4,681,041 (the "Harris '041 Patent") was issued to William Harris on July 21, 1987, and was assigned to Thrall Car Manufacturing Company. Pl. Reply Ex. 1M.

173. The invention that was the subject of the patent a lightweight center beam railroad car. This car had a body supported at each end by wheel-containing trucks. Pl. Reply Ex. 1M.

174. There is also a vertical center beam extending the length of the car between bulkheads at each end of the car. The center beam has a center sill, a top sill parallel to and spaced above the center sill, and a plurality of vertical spaced apart columns. Pl. Reply Ex. 1M.

175. The columns are connected at their lower ends to the center sill, at their upper ends to the top sill, and from the

respective bulkhead at that end inwardly along the center sill. Pl. Reply Ex. 1M.

176. There are vertical plates in the car that are joined to the top sill, center sill, bulkhead, and a plurality of the columns. The opposed facing ends of the vertical plates are spaced from each other at a distance of at least 60% of the length of the car between the bulkheads. Between the facing end of each vertical plate and the car length center, there is at least one bracing bar extending diagonally downwardly toward the car length center, from the top sill to the center sill. Pl. Reply Ex. 1M.

177. When the car is subjected to impact loads the bars on one side of the car center are placed in tension and the bars on other side of the car center are placed in compression. Pl. Reply Ex. 1M.

178. The Harris '041 Patent discloses a later generation of the same center flat beam car contained in the Wagner '031 Patent. Pl. Reply Ex. 1, at ¶¶ 46; Pl. Reply Ex. 1M.

179. In addition to other elements, the Harris '041 Patent discloses end truck assemblies, bulkheads, a center sill, U-shaped side sills, a center beam, a floor, and multiple cross bearers. These elements are also disclosed in the Wagner '031 Patent. Pl. Reply Ex. 1, at ¶¶ 46; Pl. Reply Ex. 1M.

### H. *Harris '175 Patent*

180. United States Patent Number 4,753,175 (the "Harris '175 Patent") was issued on June 28, 1988 To William Harris, and was assigned to Thrall Car Manufacturing Company. Pl. Reply Ex. 1N.

181. This patent was for a lightweight center beam railroad car. The body of this car is supported at each end by wheel-containing trucks. Pl. Reply Ex. 1N.

182. There is a vertical center beam extending the length of the car between the bulkheads at each end of the car. The center beam has a center sill, a top sill parallel to and spaced above the center sill, and a plurality of vertical spaced apart columns. Pl. Reply Ex. 1N.

183. The columns are connected at their lower ends to the center sill and at their upper ends to the top sill. Pl. Reply Ex. 1N.

184. There is a vertical plate at each end of the car extending from the center sill to the top sill and from the respective bulkhead at that end inwardly along the center sill. Each vertical plate is joined to the center sill, top sill, bulkhead, and a plurality of the vertical columns. Pl. Reply Ex. 1N.

185. The opposed facing ends of the vertical plates are spaced a distance of at least about 60% of the length of the car between the bulkheads. Between the facing end of each vertical plate and the car length center, there is at least one bracing bar. This bar extends downwardly toward the car length center from the top sill to the center sill. Pl. Reply Ex. 1N.

186. When the car is subjected to impact loads, the bars on one side of the car are placed in tension and the bars on the other side of the car are placed in compression. Pl. Reply Ex. 1N.

187. The Harris '175 Patent discloses a later generation of the same center flat beam car contained in the Wagner '031 Patent. In addition to other elements, the Harris '175 Patent discloses end truck assemblies, bulkheads, a center sill, U-shaped side sills, a center beam, a floor, and multiple cross bearers. These elements are also disclosed in the Wagner '031 Patent. Pl. Reply Ex. 1, at ¶¶ 46; Pl. Reply Ex. 1N.

### I. *Lund Drawing*

188. In 1986, Gunderson was trying to build a flat car with a center partition to

haul lumber. When the flat car Gunderson was making at the time was loaded, the car reached capacity in terms of the volume of the load before reaching capacity in terms of the weight of the load. Def. Opp. Ex. 2, at ¶¶ 5, 6.

189. John Michael Lund was an engineer in the area of freight car design at Gunderson during the mid–1980s. On August 1, 1986, he prepared a drawing of a flat car with a center partition having a depressed floor. The drawing was titled "100 Ton Center beam Bulkhead With Dropped Side Sills." Def. Opp. Ex. 2, at ¶¶ 3, 7, 8.

### J. Pritchard Disclosure

190. John Pritchard was an Assistant Marketing Manager for Lumber at Union Pacific between October 1985 and November 1987. Union Pacific is a large railroad company operating in the western part of the United States. In this position, Mr. Pritchard was attempted to entice customers to ship lumber on Union Pacific trains in the Western United States. In 1987, Union Pacific was using flat cars, sixty foot center beam cars, and boxcars to transport lumber. Tr. I, at 181–82; Def. Opp. Ex. 3, at ¶¶ 2, 4.

191. In the mid–1980s Union Pacific began to look for a way to increase capacity in an effort to haul more lumber. Tr. 1, at 182.

192. Mr. Pritchard was aware that at that time, there was a specialty fleet of depressed center flat cars being used to move large, bulky, or tall items through the railroad system. The depressed center allowed the loads that would otherwise exceed the allowable clearance to fit within the clearance. Tr. I, at 184–85.

193. Mr. Pritchard went on a plant tour at Gunderson during this time frame. On this tour, he viewed the intermodal double stacked car. This car was a depressed well intermodal car used for hauling large containers. Tr. I, at 185.

194. In the plant tour at Gunderson, Mr. Pritchard observed that the floor of the well car rode close to the rail. There were no center beam cars being made with a depressed well. Tr. I, 185–86.

195. In March 1987, Mr. Pritchard spoke with people at Gunderson about his idea for combining a center partition car with a depressed well car in order to explore the possibility of having Gunderson build the car for Union Pacific. One of the people at Gunderson with whom Mr. Pritchard spoke was William Galbraith. Tr. I, 185; Def. Opp. Ex. 3, at ¶¶ 7, 8, 9.

196. In addition to Gunderson, Mr. Pritchard spoke about his idea for a center beam car with a depressed floor with people at Weyerhauser, Boise Cascade, Louisiana Pacific, Georgia Pacific, and Potlatch. Tr. I, at 188.

197. Mr. Pritchard prepared sketches of his idea. The sketches were of a center beam car with bulkheads at the ends and a beam in the center. He also drew a straight line down between the wheels and connected it with a floor. Mr. Pritchard did not keep the sketches he drew of this car. Tr. I, at 188.

198. Mr. Pritchard did not have an engineering degree or any technical or engineering training. He did not have experience designing rail cars. Tr. I, at 195–96.

199. Mr. Pritchard did not examine from an engineering perspective whether it was possible for the dropped deck center beam flat car to be built. He did not discuss with anyone whether it was feasible to build a dropped deck center beam flat car from an engineering perspective. He never did anything to satisfy himself that a dropped deck center beam flat car could be built. Tr. I, at 195–97.

200. Mr. Pritchard never discussed with anyone whether his idea for a dropped deck center beam car would fit in the plate requirements developed by the railroad industry. Tr. I, at 197.

201. The conversations that Mr. Pritchard had about his idea were not confidential. Union Pacific also never sought patent protection for the idea. Tr. I, at 191.

202. William Galbraith was a Vice President of Sales and Marketing for Greenbrier between 1985 and 1997. On March 18, 1997, after meeting with Mr. Pritchard, Mr. Galbraith prepared a memorandum for Bruce Ward, President of Gunderson, concerning the center partition dropped floor car design that Mr. Galbraith discussed with Mr. Pritchard. Def. Opp. Ex. 4, at ¶¶ 2, 8, and 9; Tr. I, at 187.

203. Mr. Galbraith's memorandum to Mr. Ward describes the suggestion by Union Pacific that forty-eight feet, six inches of the floor in the seventy-three feet long flat car should be dropped. In his memorandum, Mr. Galbraith recommended dropping the floor twenty-six and one-half inches. This dropping of the floor would result in a railroad car with thirteen feet, four and one-eighth inches of loading space from the bottom to the top of the car over the area with the depressed floor. There would be eleven feet, two and five-eighths inches of loading space from the bottom to the top of the car at the ends of the car. Def. Opp. Ex. 4A.

204. Mr. Galbraith included a drawing of the suggested car in his memorandum. He also wrote that "as bizarre as this may look—or sound—it should be investigated with some type of strength calculation to determine if the [depressed] floor could be supported for the 48′ 6″ length, and carry the loads the extra bundles will require. Def. Opp. Ex. 4A.

205. After Mr. Galbraith wrote his March 18, 1987 memorandum, Bob Woolston, a Senior Design Engineer with Gunderson, was asked to prepare drawings and calculations related to a dropped deck center beam rail car designed to carry lumber. Mr. Woolston was provided with a copy of Mr. Galbraith's memorandum. Def. Opp. Ex. 5, at ¶¶ 2, 3.

206. Mr. Woolston prepared two pages of drawings and a page of calculations concerning the loading capacity of the car shown in Mr. Galbraith's memorandum. These documents were finished on April 16, 1987. Mr. Woolston gave the completed documents to his supervisor, Bob Landregan. Def. Opp. Ex. 5, at ¶¶ 3–4.

207. Gunderson never made a car like the one in Mr. Pritchard's drawings for Union Pacific. The reason for this was that Gunderson and Union Pacific decided it was not economically feasible at that time. Union Pacific was in the process of acquiring seventy-three foot cars at that time. Union Pacific's customers were satisfied with the seventy-three foot car. Tr. I, at 189–90.

208. Union Pacific may have been interested in the car that Mr. Pritchard drew if Gunderson had offered to build it, but Union Pacific would have needed to determine if the car would have been beneficial to its business. Tr. I, at 190.

### K. *Saxton '085 Patent*

209. United States Patent Number 6,431,085 (the "Saxton '085 Patent") was issued to Gregory Saxton on August 13, 2002, and was assigned to Gunderson, Inc. Pl. Reply Ex. 44.

210. This patent was for a center beam car with a depressed cargo carrying area. Pl. Reply Ex. 44.

### *CONCLUSIONS OF LAW AND ADDITIONAL FINDINGS OF FACT*

■ Where a party alleging patent infringement seeks a preliminary injunction

pursuant to 35 U.S.C. § 283, that party must show: (1) a reasonable likelihood of success on the merits; (2) irreparable harm if an injunction is not granted; (3) a balance of hardships tipping in its favor; and (4) an injunction's favorable impact on the public interest. *See Jack Guttman, Inc. v. Kopykake Enters., Inc.*, 302 F.3d 1352, 1356 (Fed.Cir.2002); *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed.Cir.2001); *Hybritech, Inc. v. Abbott Labs.*, 849 F.2d 1446, 1451 (Fed. Cir.1988).

These factors, taken individually, are not dispositive. Rather, the district court must weigh and measure each factor against the other factors and against the form and magnitude of the relief requested to determine whether an injunction should properly issue. *See Amazon.com*, 239 F.3d at 1350. Before a preliminary injunction may be granted, all four factors must be analyzed. A preliminary injunction may, however, be denied based on the moving party's failure to show any of the four factors, especially either of the first two, without analyzing the others. *See Jack Guttman, Inc.*, 302 F.3d at 1356.

## I. *Likelihood of Success on the Merits*

■ In order to show a reasonable likelihood of success on the merits, NSC must show, in light of the presumptions and burdens applicable at trial, both the likelihood that the accused rail car infringes the '575 Patent, and that NSC is likely to withstand any challenges by CPR to the validity and enforceability of the '575 Patent. *See Tate Access Floors, Inc. v. Interface Architectural Res., Inc.*, 279 F.3d 1357, 1365 (Fed.Cir.2002); *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed.Cir.2001); *Hybritech, Inc. v. Abbott Labs.*, 849 F.2d 1446, 1451 (Fed. Cir.1988). At the preliminary injunction stage, the patentee carries the burden of showing likelihood of success on the merits with respect to the patent's infringement,

validity, and enforceability. *Nutrition 21 v. Thorne Research, Inc.*, 930 F.2d 867, 869 (Fed.Cir.1991); *see Amazon.com*, 239 F.3d at 1350–51.

## A. *Infringement*

To demonstrate a likelihood of success with respect to infringement, the patentee must prove that it will likely show at a trial on the merits that the patent at issue is being infringed. *Amazon.com*, 239 F.3d at 1350; *see Nutrition 21*, 930 F.2d at 870 (citing *Atlas Powder Co. v. Ireco Chems.*, 773 F.2d 1230, 1233 (Fed.Cir.1985)). If a challenger raises a substantial question about infringement by asserting an infringement defense, then the patentee must prove the defense lacks substantial merit to obtain a preliminary injunction. *Amazon.com*, at 1350–51.

### 1. *Do the Accused Rail Cars Infringe the '575 Patent?*

■ Generally, infringement exists if any one of a patent's claims covers the alleged infringer's product. *Markman v. Westview Instruments Inc.*, 517 U.S. 370, 374, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). Determining if there is infringement is a two step process. First, the Court must, as a matter of law, determine the meaning and scope of the patent claims asserted to be infringed. This is known as claim construction. Second, the Court must compare the construed claims to the accused device to determine, as a matter of fact, whether all of the claim limitations are present in the accused device, either literally or by substantial equivalent. This is known as determining whether the claim limitations "read on" the accused device. *See id.; Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, (Fed.Cir.2001); *Johnson Worldwide Assoc. Inc. v. Zebco Corp.*, 175 F.3d 985, 988 (Fed.Cir.1999).

CPR concedes that the claim limitations of the asserted claims read on the accused rail cars. In the absence of a defense, therefore, there is infringement.

## 2. Section 272 Defense

CPR claims that it has a complete defense to NSC's infringement claim under 35 U.S.C. § 272 because the accused rail cars will be temporarily present in the United States. Section 272 provides that:

The use of any invention in any vessel, aircraft or vehicle of any country which affords similar privileges to vessels, aircrafts or vehicles of the United States, entering the United States temporarily or accidentally, shall not constitute infringement of any patent, if the invention is used exclusively for the needs of the vessel, aircraft or vehicle and is not offered for sale or sold in or used for the manufacture of anything to be sold in or exported from the United States.

### a. History of Section 272

Section 272 was added to the patent laws in 1952. The House and Senate Committee Reports accompanying the law describe Section 272 as "a new law relating to infringement, but it is of relatively little importance and it follows a paragraph in a treaty to which the United States is a party." H.R.Rep. No. 82–1923, at 10 (1952); S.Rep. No. 82–1979, at 8 (1952), 1952 U.S.C.C.A.N. at pp. 2394, 2402. Both committee reports also characterize Section 272 as "codif[ying] the holding of the Supreme Court [in *Brown v. Duchesne*, 60 U.S. (19 How.) 183, 15 L.Ed. 595 (1856)] that use of a patented invention on board a foreign ship does not infringe a patent." H.R.Rep. No. 82–1923, at 28; S.Rep. No. 82–1979, at 8, 1952 U.S.C.C.A.N. at p. 2422.

The defendant in *Brown* used the plaintiff's patented improvement for constructing the gaff of sailing vessels. The defendant was a French citizen who sailed a ship built in France and owned by French citizens from France to Boston and back to France. 60 U.S. (19 How.) at 195.

The *Brown* Court expressed concern that allowing the plaintiff a remedy under American patent laws in this situation would result in an extraterritorial application of the patent laws. The Supreme Court held that the patent was not infringed because the only benefit that the defendant got from the use of the invention was outside the jurisdiction of the United States. Any damage sustained by the plaintiff from the improvement being used in United States territory as the ship was navigated into and out of the Boston port was "so minute that it [was] incapable of any appreciable value." *Id.* at 195–96.

### b. Cases Interpreting Section 272

The Court is aware of only two cases interpreting Section 272 since its enactment in 1952: *Cali v. Japan Airlines, Inc.*, 380 F.Supp. 1120 (E.D.N.Y.1974) and *Hughes Aircraft Co. v. United States*, 29 Fed. Cl. 197 (1993).

The *Cali* plaintiff had a patent for a modification to jet engines. The defendants, foreign airlines, used the plaintiff's modification on passenger and cargo flights to and from the United States and over the United States. The court held that the invention was temporarily present in the United States because temporarily could not mean any less than entering the United States for the purpose of completing a voyage, turning about, and continuing or commencing a new voyage. *Cali*, 380 F.Supp. at 1122, 1126.

The patented invention at issue in *Hughes* was an attitude control system for a spacecraft brought to the United States from the United Kingdom. The spacecraft was held to be temporarily present in the United States under Section 272 because it

entered the United States one time for the sole purpose of being launched into outer space. Additionally, the Court found that the invention was exclusively for the needs of a vehicle because it was the spacecraft attitude control system. *Hughes Aircraft,* 29 Fed. Cl. at 241.

 c. *Does Section 272 Apply to the Present Case?*

 (1) *Are the Accused Rail Cars Used in a Vehicle of Another Country?*

■ The accused rail car, itself, is not a vehicle. It is part of a vehicle—a train. A train satisfies the vehicle requirement of Section 272. The question is whether the train carrying the accused rail cars is a vehicle of another country.

The accused rail cars will be brought into the United States on a train powered by a CPR locomotive, and for as long as CPR's rail lines continue in the United States, the cars will remain part of a train powered by a CPR locomotive. During this period, the accused rail cars are part of a vehicle of another country.

After the CPR rail lines end in the United States, the cars will be switched to trains powered by locomotives owned and operated by United States companies. The cars will then continue to travel to various destinations in the United States. The cars will not return to trains powered by CPR locomotives until the cars return to places in the United States served by CPR. During the time the accused rail cars are part of trains powered by locomotives owned and operated by United States companies, the accused rail cars are not used in a vehicle of another country.

The present case is different from *Brown, Cali,* and *Hughes.* In those three cases, the patented invention remained a part of a vehicle that was under the flag of the other country when the vehicle and the invention were in the United States. In *Hughes,* the vehicle was used by NASA, but the vehicle was still of the United Kingdom. In the present case, the accused rail cars are not being used by another country when the accused rail cars are hauled by a locomotive owned and operated by a United States company. Instead, the train is of the United States because the train is powered by a locomotive owned and operated by a United States company. *See* Findings of Fact, ¶¶ 60–64, 77.

 (2) *Are the Accused Rail Cars Temporarily Present in the United States?*

The accused rail cars are being brought into the United States to be used on railway lines shipping lumber to various destinations within the United States. An accused rail car will spend the majority of its time delivering lumber to United States destinations. This is not the same as the airplanes in *Cali* that returned home after flying into the country, the ship in *Brown* which returned home after sailing to Boston, or the spacecraft in *Hughes* which went to outer space after being in the United States for the spacecraft's takeoff.

Additionally, CPR will derive significant benefits from using the accused rail car in the United States by transporting its lumber on the accused rail cars to various destinations throughout the United States. The presence in the United States of the patented invention in *Brown, Cali,* and *Hughes* was temporary because the only real benefits of using the accused product for the defendants in those cases came when the product was used outside of the United States.

For both of these reasons, the accused rail cars will not be temporarily present in the United States. *See* Findings of Fact, ¶¶ 60–64, 75–82.

(3) *Are the Accused Rail Cars Used Exclusively for the Needs of the Train?*

The statute's legislative history shows that the statute was supposed to do no more than codify *Brown.* The holding in *Brown* provided protection for patented inventions used on ships when the invention was used exclusively for the needs of the vessel and the ship temporarily entered American waters.

In *Cali, Brown,* and *Hughes,* the accused product was being used in a part of the vehicle that was essential to making the vehicle work. In *Cali,* it was an improvement to the engine of an airplane. In *Brown,* it was a modification to a sail on a sailboat. In *Hughes,* it was an object which helped control the positioning of the spacecraft.

In the present case, the trains can work without the accused rail car. The accused rail car does not help propel the trains, help in positioning the trains, or help in any other way to make the trains work. The accused rail cars, therefore, are not used exclusively for the needs of the vehicle. *See* Findings of Fact, ¶¶ 60–64.

(4) *Are the Accused Rail Cars Sold in the United States?*

[Redacted]

Because at least three of the required elements—being part of a vehicle of another country, temporary presence in the United States, and use exclusively for the train's needs—are not present and because it appears that the accused rail cars will be sold in the United States, CPR's defense based on Section 272 lacks substantial merit.

B. *Validity*

■ A patent is entitled to a strong presumption of validity. 35 U.S.C. § 282. This presumption exists at every phase of the litigation, including the preliminary injunction stage. *Canon Computer Sys.,*

*Inc. v. Nu–Kote Int'l, Inc.,* 134 F.3d 1085, 1088 (Fed.Cir.1998). At the preliminary injunction stage, it is the challenger's burden to show that there is a "substantial question" of validity. *See Tate Access Floors,* 279 F.3d at 1365; *Genentech, Inc. v. Novo Nordisk, A/S,* 108 F.3d 1361, 1364 (Fed.Cir.1997). If the challenger raises a substantial question, then the burden shifts to the patentee to show that the defense "lacks substantial merit." *See Tate Access Floors,* 279 F.3d at 1365; *Genentech,* 108 F.3d at 1364.

The presumption of patent validity is not itself evidence to be weighed in determining the likelihood of success. However, when an alleged infringer does not challenge the patent's validity with evidence, the patent owner need do no more to establish its rights under the patent. It is only when the challenger presents evidence casting doubts on the validity of the patent that the patentee must respond to show the challenges lack substantial merit. *See Helifix Ltd. v. Blok–Lok Ltd.,* 208 F.3d 1339, 1351; *Genentech,* 108 F.3d at 1364.

CPR makes a twofold challenge to the '575 Patent's validity. First, CPR claims that the patent was invalid because the claims of the '575 Patent were anticipated from prior art. *See* 35 U.S.C. § 102(e); *Verdegaal Bros., Inc. v. Union Oil Co.,* 814 F.2d 628, 631–32 (Fed.Cir. 1987). Second, CPR claims that the prior art rendered the '575 Patent obvious under 35 U.S.C. § 103.

■ Determinations regarding anticipation and obviousness involve two steps. First, the court, as a matter of law, must construe the claim in the patent. Second, the construed claim must be compared to the prior art. *See Key Pharm. v. Hercon Labs. Corp.,* 161 F.3d 709, 714 (Fed.Cir. 1998); *Glaxo Inc. v. Novopharm Ltd.,* 52 F.3d 1043, 1047 (Fed.Cir.1995); *Beachcombers Int'l, Inc. v. WildeWood Creative*

*Prods., Inc.,* 31 F.3d 1154, 1160, 1163 (Fed. Cir.1994).

### 1. *Claim Construction*

■ Claim construction begins with the language of the claims. *Tate Access Floors, Inc.,* 279 F.3d at 1370; *Johnson Worldwide Assocs.,* 175 F.3d at 989. There is a presumption that a Court shall give full effect to the ordinary and accustomed meaning of claim terms as understood by one of ordinary skill in the art. *Tate Access Floors,* 279 F.3d at 1370; *Johnson Worldwide Assocs.,* 175 F.3d at 989. The presumption in favor of the ordinary meaning may be overcome where: (1) a patentee has chosen to become his own lexicographer by clearly and explicitly defining the claim term in the patent; or (2) the claim term would render the claim devoid of clarity leaving no means by which the scope of the claim may be ascertained from the language used. *Tate Access Floors,* 279 F.3d at 1370; *Bell Atl. Network Servs., Inc. v. Covad Communications Group, Inc.,* 262 F.3d 1258, 1268 (Fed.Cir.2001).

In construing the meaning of the language of a claim, there are two types of evidence that the Court can consider— intrinsic and extrinsic. *See, e.g., Pitney Bowes, Inc. v. Hewlett–Packard Co.,* 182 F.3d 1298, 1308–08 (Fed.Cir.1999); *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1581–82 (Fed.Cir.1996). There are three sources of intrinsic evidence. The first, and most important, is the language of the claims themselves. The second is the specification, which is the written description of the claims including a description of a preferred embodiment of the protected invention. The third and final source of intrinsic evidence is the file or prosecution history, which is the record created during the process of applying for the patent. *Vitronics Corp.,* 90 F.3d at 1582.

Extrinsic evidence consists of all other sources of evidence regarding the meaning of the claim terms. *Id.* at 1584. Typical examples of extrinsic evidence include prior art (other patents and inventions relevant to or related to the patent in question) and expert testimony. Expert testimony on claim construction, however, is disfavored. Prior art documents are deemed a more objective and reliable guide than testimonial evidence. Unlike expert testimony, these sources are accessible to the public in advance of litigation. *Id.* at 1585.

■ The Court must first consider the intrinsic evidence. If based on a review of the intrinsic evidence the Court can fairly determine the meaning of claim terminology, the inquiry ends. Thereafter, it is improper to rely on extrinsic evidence to contradict such definitions. *Id.* at 1583. Extrinsic evidence may be relied upon only if genuine ambiguity remains after a review of the intrinsic evidence. *Pitney Bowes,* 182 F.3d at 1309–09.

■ In considering the intrinsic evidence, the Court must look first to the language of the claims, which define the scope of the protected invention. *Bell Atl. Network Servs.,* 262 F.3d at 1267 (Fed.Cir. 2001); *Bell Communications Research, Inc. v. Vitalink Communications Corp.,* 55 F.3d 615, 619 (Fed.Cir.1995). The words of the claims are given more weight than any other evidence. *Eastman Kodak Co. v. Goodyear Tire & Rubber Co.,* 114 F.3d 1547, 1552 (Fed.Cir.1997), *overruled on other grounds by Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448, 1454–55 (Fed. Cir.1998) (en banc). Definitions from dictionaries or recognized authorities can be helpful to understand how one of ordinary skill in the art construes claim terms, and can be consulted by the Court for this purpose at any time. *Vitronics Corp.,* 90 F.3d at 1584 & n. 6; *see Envirco Corp. v.*

*Clestra Cleanroom Inc.*, 209 F.3d 1360, 1365 (Fed.Cir.2000).

Another principle of claim construction teaches that the Court should give claim terms their ordinary and customary meaning unless the specification or file history clearly discloses any special or alternative meaning. *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed.Cir.2001); *Vitronics Corp.*, 90 F.3d at 1582; *see Zelinski v. Brunswick Corp.*, 185 F.3d 1311, 1315 (Fed.Cir.1999). The specification and the file history are before the Court and must be considered at the appropriate time.

The claim terms of the '575 Patent that needs to be construed is: (1) flat car, (2) bulkhead, (3) center beam, (4) floor, and (5) side sill transition means.[2]

Turning to the plain language of the claims, the Court concludes that it is appropriate to consult definitions of a recognized authority in the field of rail cars to assist in construing the meaning of the claim limitations in dispute. The Court relies on *The Car and Locomotive Cyclopedia of American Practices*, Fifth Edition ("the Cyclopedia") published in 1984. The parties have pointed to this edition as being the most current edition when the '575 Patent was issued.

### a. *Flat Car*

■ The ordinary meaning of the term "flat car" is a "freight car having a flat floor or deck laid on the underframe, with no sides, ends or roof, designed for handling commodities not requiring protection from the weather." *See* The Cyclopedia, at 54.

The '575 Patent uses the term "flat car" in a way that is consistent with the term's ordinary meaning. Claims 1 and 2, for example, claim a "flat car supported on end truck assemblies." The truck assemblies in the '575 Patent contain the parts of the rail car that support the flat car such as the center sill, side sill, and draft sills that are main structural pieces of the rail car's underframe. The wheels of the rail car are also in the truck assemblies, and the wheels also help support the rail car. The '575 Patent also does not include in the claims or in the specification any structures that could be construed as sides, ends, or a roof.

In describing the prior art in standard center beam flat cars, the '575 Patent discusses how standard center beam flat cars carry lumber and other construction material and that the invention in the '575 Patent is designed to carry these same materials. Lumber and other construction materials are commodities not needing protection from the weather. *See* Findings of Fact, ¶¶ 111–112, 119, 122, 125–136, 139–142.

### b. *Bulkhead*

■ The ordinary meaning of the term "bulkhead" is "a vertical partition generally extending the full width of a car and usually used to restrain lading." *See* The Cyclopedia, at 40. This is how the term bulkhead is used in the '575 Patent.

The bulkhead assembly in the '575 Patent is mounted above the draft sill assembly that is at approximately the same height as the wheels. The bulkhead assembly is connected to the upper side sills that are on the outside of the center beam and are at approximately the same height as the top of the center beam. The result

---

**2.** There are other technical terms in the '575 Patent, but the meanings of these other terms are either not disputed by the parties or are not needed for disposition of the plaintiff's motion. The Court, therefore, need not construe the meaning of these terms. *See Vivid Techs., Inc. v. American Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed.Cir.1999) ("only those terms need be construed that are in controversy").

is that the bulkhead extends the vertical length of the car.

The bulkhead assembly called for in the preferred embodiment is to be one of conventional design at the time of the '575 Patent. According to the Cyclopedia, bulkheads are usually used to restrain lading. A bulkhead assembly of conventional design as called for in the preferred embodiment of the '575 Patent would be something that performs the usual functions of a bulkhead including restraining lading.

Additionally, in the summary of the invention in the '575 Patent, bulkheads are discussed as standard features of center beam cars. Standard features generally perform the feature's usual function, and for bulkheads this is to restrain lading.

Finally, as the bulkheads in the '575 Patent are to be of conventional design and are part of the standard features of a center beam flat car, the bulkheads are construed as extending the full width of the car because that is what a bulkhead ordinarily does. *See* Findings of Fact, ¶¶ 111–112, 119, 122, 139–141.

#### c. *Center Beam*

■ The Court concludes, and the parties agree that the ordinary meaning of "center beam" is a structure that runs lengthwise in a rail car and serves two functions. First, it strengthens the bed of the car allowing for the use of a lighter underframe. Second, it provides a structure to secure the load to the car. *See* pl. Reply Ex. 1, at ¶ 7; Def. Opp. Ex. 1, at ¶ 13.

Claims 1 and 2 of the '575 Patent discuss a vertical center beam assembly that extends the length of the car between the bulkheads. The preferred embodiment also states that the center beam assembly extends along the longitudinal centerline of the rail car.

Additionally, the summary of prior art in the '575 Patent discusses how one advantage center beam flat cars enjoy over other rail cars is that center beam flat cars are lighter because of the center beam. The '575 Patent uses the same type of center beam that had been used in previous center beam flat cars resulting in the center beam of the '575 Patent strengthening the bed of the rail car and allowing a lighter underframe to be used.

The summary of prior art discusses how lumber is stacked on both sides of the center beam in standard center beam flat cars. The '575 Patent has the same type of center beam, and the center beam is to be used the same way that it was used in standard center beam flat cars. The result is that the center beam in the '575 Patent is a structure to which the load being carried can be attached. *See* Findings of Fact, ¶¶ 111–112, 119–120, 124, 136, 139–142.

#### d. *Floor*

■ The ordinary meaning of the term "floor" is "the layer of material which is placed on top of the underframe of a car and provides the direct support for the car contents." *See id.* at 54. This is the way the term is used in the '575 Patent.

Claim 20 of the '575 Patent focuses on the floor of the rail car. Both the upper floor section and the intermediate floor section which is below the upper floor sections are carried on the body of the rail car. The body is comprised of the structures in the underframe of the car. This underframe is supporting the floor.

Additionally, the preferred embodiment of the '575 embodiment discusses how the contents of the rail car disclosed in the '575 Patent are to be placed directly on the floor. The floor provides direct support for the rail car's contents as the rail car in the '575 Patent is designed to carry

approximately 200,000 pounds of lumber, and the preferred embodiment calls for the contents to be placed on the floor. *See* Findings of Fact, ¶¶ 111–120, 123–136, 139–142.

### e. *Side Sill Transition Means*

■ Asserted claims 5, 6, and 7 each include an element for "side sill transition means for joining said end sections of·each of said side sill assemblies to said intermediate section." Under 35 U.S.C. § 112, ¶ 6, a claim element "may be expressed as means or step for performing a specified function without the recital of structure, material, or acts in support thereof." An element that fits within this definition is a means-plus-function element. Claims of this type are to be construed to cover the corresponding structure described in the specification. *Id.*

■ To determine if a claim is a means-plus-function element, the Court must construe the claim. *Kemco Sales v. Control Papers Co.,* 208 F.3d 1352, 1360 (Fed.Cir.2000); *Personalized Media Communications v. Int'l Trade Comm'n,* 161 F.3d 696, 702 (Fed.Cir.1998). There is a presumption that the element is to be construed in accordance with Section 112, Paragraph 6 when the term "means" is used in the claim. *Kemco Sales,* 208 F.3d at 1361; *Cortland Line Co. v. Orvis Co.,* 203 F.3d 1351, 1357 (Fed.Cir.2000). The presumption may be rebutted if the claim element recites sufficiently definite structure or material to perform the claimed function. *Kemco Sales,* 208 F.3d at 1361; *see Al–Site Corp. v. VSI Int'l,* 174 F.3d 1308, 1318 (Fed.Cir.1999). To determine if a presumption has been rebutted, the Court may look to intrinsic and extrinsic evidence. *Personalized Media Communications,* 161 F.3d at 703.

■ Construing the meaning of a means-plus-function claim is a two step process. First, the function claimed in the element must be determined. *Multiform Desiccants, Inc. v. Medzam, Ltd.,* 133 F.3d 1473, 1479 (Fed.Cir.1998). Second, there must be a determination of what structure or material disclosed in the specification performs the function claimed in the element. *See Overhead Door Corp. v. Chamberlain Group,* 194 F.3d 1261, 1271–73 (Fed.Cir.1999). At this point the means-plus-function claim can be construed in accordance with the statute.

In construing "side sill transition means," the use of the term "means" creates a presumption that this is a means-plus-function element. The presumption that "side sill transition means" is a means-plus-function element is not rebutted because claim 5 does not contain the structure or material that is to perform the function. The function claimed in claim 5 is the joining of the end section of each side sill assembly to the intermediate sections of the side sill assembly. The structure designed to perform this function is not in claim 5, but is instead in the preferred embodiment beginning at column 4, line 7 of the '575 Patent. At that point, a "side sill transition assembly" that connects the upper side sill end sections with the depressed side sill sections is described. Under Section 112, Paragraph 6, a means-plus-function element is to be construed to cover the corresponding structure which with respect to claim 5 of the '575 Patent is the side sill transition assembly. *See* Findings of Fact, ¶¶ 111–120, 123–136, 139–142.

### 2. *Anticipation*

■ A patent is invalid for anticipation when the same device or method, having all of the elements contained in the claim limitations, is described in a single prior art reference. *Crown Operations Int'l v. Solutia Inc.,* 289 F.3d 1367, 1375 (Fed.Cir.2002). An anticipating reference

must describe the patented subject matter with sufficient clarity and detail to establish that the subject matter existed in the prior art and that such existence would be recognized by persons of ordinary skill in the field of invention. *Id.; see Scripps Clinic & Research Found. v. Genentech, Inc.,* 927 F.2d 1565, 1576 (Fed.Cir.1991). It is enough to find anticipation if a single prior art reference discloses expressly or inherently, each and every element of the claim. *Verdegaal Brothers,* 814 F.2d at 631.

The elements in the prior art reference must be arranged in the same way as in the challenged patent. Strict compliance with this standard is required, and "a prior art disclosure that almost meets [the] standard ... does not anticipate" under 35 U.S.C. § 102. *Structural Rubber Prods. Co. v. Park Rubber Co.,* 749 F.2d 707, 716 (Fed.Cir.1984). Anticipation may not be shown by equivalents. Instead, every element of the claimed invention "must be literally present" in a single prior art reference "arranged as in the claim." *Richardson v. Suzuki Motor Co.,* 868 F.2d 1226, 1236 (Fed.Cir.1989). The prior art must show the identical invention in as complete detail as is contained in the patent claim. *Id.* Against these legal standards, anticipation is a question of fact requiring comparison of the claimed invention with the relevant prior art. *See Scripps Clinic & Research Found.,* 927 F.2d at 1576.

CPR claims that the Udstad '020 Patent anticipates each of the asserted claims except claim 23. The Court finds that the Udstad '020 Patent does not disclose each and every limitation of the '575 Patent as is required for the '575 Patent to be invalid because of anticipation. CPR has not raised a substantial question on whether the Udstad '020 Patent anticipated the '575 Patent by having all of the elements contained in each of the asserted claims. Even if CPR raised a substantial question concerning validity, NSC has met its burden of showing that CPR's defense based on anticipation lacks substantial merit.

The Udstad '020 Patent does not disclose a "flat car" as that term is used in all the asserted claims. As construed by the Court, flat car as used in the '575 Patent is a freight car with no sides, ends, or roof. Udstad has both removable and permanent side walls, end walls, and a roof. The Udstad '020 Patent and the '575 Patent are for different structures. The Udstad '020 Patent is for a modified box car. This is a different type of rail car than the flat car covered in the '575 Patent. A flat car hauls commodities not requiring protection from the weather. Udstad was designed to haul automobile subassemblies, a commodity that does require protection from the weather. One of the goals of having the walls, sides, and roof in Udstad was to protect the car's cargo from weather and vandalism.

Udstad does not disclose "bulkheads" as that term is used in all the asserted claims. As construed by the Court, a bulkhead in the '575 Patent is the structure at the end of the rail car that provides longitudinal restraint for the car's cargo. Udstad does have end walls, but these walls are to enclose the car and protect the cargo from weather and vandalism. The bulkheads in the '575 Patent are not used to enclose the car or protect the cargo from weather and vandalism. Instead, these bulkheads are to provide longitudinal restraint for the load to be carried. The bulkheads of the '575 Patent contact the lumber and restrain it in a loaded car unlike the Udstad where the cargo is attached to side walls and never touches the end walls.

Udstad does not disclose a "floor" as that term is used in all of the asserted claims. As construed by the Court, a floor

is an element that provides direct support for the contents of a rail car. The claims in Udstad never mention a floor. The specification in Udstad calls for the rail car described in Udstad to have a "false floor" that does not directly support the contents of the rail car. The direct support for the contents of the rail car in Udstad are the side walls to which the automobile subassemblies are fastened. The "false floor" of Udstad is there only to protect the cargo from weather and vandalism. In the '575 Patent, the contents of the car are to be placed on the floor, and this floor provides the direct support for the contents.

Udstad does not anticipate a "center beam" as that term is used in asserted claims 1, 2, 3, 5, 6, 7, 8, and 9. As construed by the Court, a center beam in the '575 Patent is a structure running lengthwise in a rail car that strengthens the bed of the car and provides a structure to secure the load of the car. Udstad contains a center sill girder structure. The load of the car cannot be secured to this structure so the center sill girder structure does not perform one of the functions required of the center beam used in the '575 Patent. CPR also has not presented evidence that the center sill girder structure provides strength to the bed of the car, the other required function of a center beam. Finally, the parties have not presented and the Court is unaware of any references to Udstad as a center beam car.

CPR has not raised a substantial question with respect to anticipation of asserted claims 5, 6, and 7. These asserted claims each include an element "side sill transition means for joining said end sections of each of said side sill assemblies to said intermediate section." The Court has construed these claims as "means-plus-functions" limitations permitted by 35 U.S.C. § 112, ¶ 6. For CPR's anticipation defense to be successful, Udstad must an-

ticipate a side sill transition assembly. This assembly is claimed in the '575 Patent because it is the structure performing the function of the means-plus-function claims of the '575 Patent.

CPR's expert, Wayne Clowers, did not know what a means-plus-function element was at his deposition, and therefore, did not construe these claims as the statute requires. At the evidentiary hearing, Mr. Clowers restated his conclusion that these claims did not contain a means-plus-function element. He also testified that even if the element was a means-plus-function element, Udstad anticipated it because Udstad had a point where there was a transition from a depressed floor to a non-depressed floor, and the transition had a function of combining these two parts of the floor. This explanation does not show how Udstad anticipated the side sill transition assembly.

Because Udstad does not anticipate a flat car, bulkheads, a center beam, a floor, or a side sill transition means that used a side sill transition assembly, CPR has not raised a substantial question regarding the validity of the asserted claims with its anticipation defense. Even if a substantial question has been raised, NSC has shown that CPR's anticipation defense lacks substantial merit. *See* Findings of Fact, ¶¶ 111–146.

3. *Obviousness*

 A patent is invalid for obviousness only if differences between the subject matter sought to be patented and the prior art are such that the subject matter as whole would have been obvious at the time of the invention to a person having ordinary skill in the art to which the subject matter pertains. 35 U.S.C. § 103(a). An ultimate determination regarding nonobviousness is a matter of law. This determination is based on four underlying

factual inquiries: (1) the scope and content of the prior art; (2) the differences between the prior art and the asserted claims; (3) the level of ordinary skill in the pertinent art; and (4) secondary considerations that are relevant to nonobviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); *McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1349 (Fed.Cir.2001); *SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp.*, 225 F.3d 1349, 1355 (Fed.Cir.2000); *Al–Site Corp.*, 174 F.3d at 1323.

a. *Scope and Content of Prior Art*

 The prior art relevant to the nonobviousness includes art that is the same as the invention's art and those arts that logically relate to the inventor's concern. *Shatterproof Glass Corp. v. Libbey–Owens Ford Co.*, 758 F.2d 613, 620 (Fed. Cir.1985). Art that is not accessible to the public generally is not recognized as prior art. *See OddzOn Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1402 (Fed.Cir. 1997). For the purposes of the nonobviousness inquiry, prior art encompasses those items described by 35 U.S.C. § 102(a), (b), (e), (f), and (g).

. Items included as prior art are: (1) inventions that were patented or described in a printed publication from anywhere in the world before the patent applicant's date of invention; (2) inventions used or known by others in the United States before the applicant's date of invention; (3) inventions that were in public use or on sale in the United States more than one year prior to the date of the patent application; (4) inventions described in another United States patent application filed before the applicant's date of invention; (5) inventions granted a patent after a filing of a United States patent application before the applicant's date of invention; (6) subject matter sought to be patented that was not invented by the applicant; and (7) inventions of another that were made in the United States and not abandoned, suppressed, or concealed before the applicant's date of invention. *See* 35 U.S.C. §§ 102(a), (b), (e), (f), and (g), 103; *OddzOn Prods.*, 122 F.3d at 1401–04.

CPR claims that the Udstad '020 Patent, the Miller '399 Patent, and the Wagner '031 Patent are prior art. The Court finds that these three patents fit within the definition of prior art because the patents were for inventions patented before the '575 Patent. *See* Findings of Fact, ¶¶ 143, 147, 155.

CPR claims that the Pritchard disclosure is prior art. CPR considers the Lund drawing information that relates to the prior art. NSC argues that the Lund drawing and the Pritchard disclosure should not be considered prior art. It also argues that the Lund drawing is not relevant to the other prior art.

 Neither the Lund drawing nor the Pritchard disclosure are prior art within the meaning of the Patent Act because neither item was accessible to the public. These two items do not fit within the prior art described in 35 U.S.C. § 102(a), (b), (e), (f), or (g) as the rail car described in these items was not patented, described in a printed publication, known or used by others, on sale, or invented by others prior to the issuance of the '575 Patent.

The Pritchard disclosure was initiated by an assistant marketing manager at Union Pacific who discussed his idea for combining a center partition car with a depressed well car with people at Gunderson as well as other businesses in the industry. There were drawings of this idea prepared by Mr. Pritchard, a sales and marketing vice president at Greenbrier, and an engineer at Gunderson. This was as far as Mr. Pritchard's idea was taken. The rail car in these drawings was not patented. There was not any public distribution of these drawings. Without being accessible to the

public, the Pritchard disclosure cannot qualify as prior art.

The Lund drawing was prepared by an engineer at Gunderson, but Gunderson never attempted to patent this design or otherwise make the information known to the public. If anything, the Lund drawing was a failed attempt at inventing a center partition car with a depressed well. This attempt was abandoned, suppressed, and concealed, and thus is the exact opposite of items that qualify as prior art under Section 102(g) which allows for inventions that were not concealed, suppressed, or abandoned to be considered prior art.

The Lund drawing also is not information related to the prior art because it was not within the knowledge of one of ordinary skill in the art. Although an individual of ordinary skill in the art is presumed to have knowledge of all of the prior art, the ordinary person would not have knowledge of the Lund drawing. The drawing was never made accessible to the public. Additionally, as Mr. Lund did not have an engineering or rail car design background and as he never discussed with any engineers or rail car designers whether the car in his drawing could be built, his drawing is not relevant to what would have been obvious to a person of ordinary skill in the art. *See* Findings of Fact, ¶¶ 188–208.

### b. *Level of Ordinary Skill*

■ The hypothetical person of ordinary skill in the art is someone aware of all the pertinent prior art. *Custom Accessories v. Jeffrey–Allan Indus., Inc.,* 807 F.2d 955, 962 (Fed.Cir.1986). The parties agree that the hypothetical person of ordinary skill in the art at the time of the '575 Patent would have a college degree in engineering or design and approximately five to ten years of experience in designing rail cars. *See* Def.'s Opp. at 24–25; Pl.'s Reply at 37.

### c. *Differences Between '575 Patent and Prior Art*

With respect to determining the differences between the invention and prior art, the analysis begins with the Court viewing the situation at the time the invention was made. *Ecolochem, Inc. v. Southern Cal. Edison Co.,* 227 F.3d 1361, 1371 (Fed.Cir. 2000). The Court must consider the thinking of one of ordinary skill in the art, guided only by the prior art references and the then accepted wisdom in the field. *See id.* (citing with approval *In re Dembiczak,* 175 F.3d 994, 999 (Fed.Cir.1999)). There must not be "hindsight reconstruction to pick and choose among isolated disclosures in the prior art" from which one can arrive at the claimed invention. *Ecolochem,* 227 F.3d at 1371 (quoting *In re Fine,* 837 F.2d 1071, 1075 (Fed.Cir.1988)).

■ The prior art must have suggested the desirability of making the claimed invention. *Ryko Mfg. Co. v. Nu–Star, Inc.,* 950 F.2d 714, 718 (Fed.Cir.1991). There is not a requirement that the prior art contain an express suggestion to combine known elements. The suggestion may come from the prior art filtered through the knowledge of one skilled in the art. *Motorola, Inc. v. Interdigital Tech. Corp.,* 121 F.3d 1461, 1472 (Fed.Cir. 1997). The suggestion may also be implicit from the prior art as a whole. *In re Kotzab,* 217 F.3d 1365, 1370 (Fed.Cir. 2000). There must be some showing, however, of a suggestion or motivation to modify the teachings of a prior art reference before an invention will be found unpatentable because of obviousness. *Id.*

When comparing the claimed invention and the prior art, it must be remembered that most, if not all, inventions arise from a combination of old elements. *In re Kotzab,* 217 F.3d at 1369. In many situations, every element of a claimed invention may be found somewhere in the prior art, but

identification of each individual part of the invention in the prior art is insufficient to defeat patentability of the entire claimed invention. *Id.* at 1370. There must be some suggestion, motivation, or teaching of the desirability of making the specific combination that was made by the applicant. *Id.* at 1370. A challenger to a patent cannot combine prior art references without evidence of such a suggestion, teaching, or motivation because without this evidence, the inventor's disclosure is being used as a blueprint for impermissibly piecing together the prior art. *Ecolochem,* 227 F.3d at 1371–72.

When inquiring as to the facts surrounding whether there was a suggestion, teaching, or motivation to combine the prior art references, a Court must be thorough and searching. *In re Lee,* 277 F.3d 1338, 1343 (Fed.Cir.2002). The Court must make particular findings "as to the reason the skilled artisan, with no knowledge of the claimed invention, would have selected these components for combination in the manner claimed." *In re Kotzab,* 217 F.3d at 1371. There must be objective evidence that allows for an explanation of why one of ordinary skill would have selected the references and why this selection was obvious. *See In re Lee,* 277 F.3d at 1341.

(1) *Were the Asserted Claims Obvious in Light of the Udstad '020 Patent, the Wagner '031 Patent, and the Miller '399 Patent?*

■ CPR first argues that the Udstad '020 Patent by itself renders all the asserted claims invalid for obviousness. CPR argues that claim 23 of the '575 Patent makes one addition to claim 1 of the '575 Patent by adding an element directed to upper ends sections of the side sills that have a U-shaped cross sectional configuration. CPR argues that the new element in claim 23 was a matter of design choice that was a well known option at the time of the '575 Patent. With respect to

the other asserted claims, CPR states that to the extent the claims are not in Udstad, the Udstad reference makes the claims obvious.

As discussed in the section on anticipation, Udstad does not disclose each of the elements in claim 1 of the '575 Patent. In the anticipation section, the Court found that Udstad did not disclose a flat car, a floor, bulkheads, or a center beam, all of which are elements in claim 1 of the '575 Patent.

Udstad teaches away from the asserted claims. The car in Udstad is a modified box car and not a flat car. A flat car would not have served the goals of Udstad because the car in Udstad was designed to transport automobile subassemblies on a car that protected the subassemblies from the weather. A flat car that is open to the elements, as the rail car in the '575 Patent is, would not have protected the automobile subassemblies. Additionally, the goals of the rail car in the '575 Patent could not be satisfied by the rail car in Udstad. The rail car in the '575 Patent sought to lower the center of gravity of the car and to transport lumber products by securing the lumber to a center beam. In Udstad, the automobile subassemblies were attached to the side of the car which would not lower the center of gravity of the car nor provide a center beam structure to which cargo could be attached.

CPR next argues that the '575 Patent is invalid as obvious over the combination of the Udstad '020 Patent and the Wagner '031 Patent. This argument is based on the Wagner '031 Patent disclosing upper end sections with a U-shaped cross sectional configuration. This element was lacking in Udstad. It is contained in claim 23 of the '575 Patent. CPR argues that the presence of this element in the Wagner '031 Patent demonstrates that it was a common design choice for a person of ordinary skill in the art.

At the time the '575 Patent was invented, there was no suggestion, teaching, or motivation to combine Udstad with the Wagner '031 Patent in the way suggested by CPR. Showing that the elements claimed in the '575 Patent existed somewhere in the prior art is not enough to show that a claim is invalid for obviousness. Even if together Udstad and the invention in the Wagner '031 patent contained some of the features that are in the invention in the '575 Patent, there must still be a suggestion, teaching, or motivation to combine the elements in the way the elements are arranged in the '575 Patent before there can be obviousness. Neither Udstad nor the Wagner '031 Patent suggest combining certain elements from the two inventions to create the rail car that is the subject of the '575 Patent.

Additionally, the Wagner '031 Patent teaches away from the invention in the '575 Patent. The invention in the Wagner '031 Patent attempted to make rail cars shipping lumber more efficient by reducing the weight of a standard center beam flat car. The volume of lumber to be carried on these rail cars was the same volume that was to be carried on the standard center beam flat cars. The invention in the '575 Patent is different because it attempted to make rail cars shipping lumber more efficient by allowing each individual car to carry a greater volume of lumber.

CPR argues that the Wagner '031 Patent in combination with the Miller '399 Patent renders all of the asserted claims invalid as obvious. The argument is that all of the claimed elements of the '575 Patent were disclosed in either the Wagner '031 Patent or the Miller '399 Patent. As one of ordinary skill in the art is presumed to have knowledge of the relevant prior art, CPR's argument is that there was obvious motivation to combine elements of the Wagner '031 Patent with elements of the Miller '399 Patent to create the invention in the '575 Patent.

As with its obviousness argument based on combining Udstad with the Wagner '031 Patent, CPR has not presented evidence showing a motivation, teaching, or suggestion to combining the Wagner '031 Patent with the Miller '399 Patent.

The Miller '399 Patent also teaches away from the invention in the '575 Patent. The Miller '399 Patent is for a gondola car that maintains the volume of the cargo being shipped and makes the rail car better at traveling over poor track at high speeds. In contrast, the '575 Patent covers a flat car that sought to increase the volume of lumber that could be shipped and not maintain the volume of cargo being shipped as the Miller '399 Patent suggested.

The rail car in the Miller '399 Patent has a depressed center with sloped sides. The sides of the depressed center in the '575 Patent were vertical and not sloped like the sides of the depressed center in the Miller '399 Patent. Having sloped sides for the depressed center in the '575 Patent would have interfered with the goal of the '575 Patent of increasing the volume of lumber being carried on the rail car.

Neither Udstad, Udstad combined with the Wagner '031 Patent, nor the Wagner '031 Patent combined with the Miller '399 Patent raise a substantial question regarding the validity of any of the asserted claims. This obviousness challenge by CPR, therefore, fails. *See* Findings of Fact, ¶¶ 111–150, 155–156.

(2) *Did the Patent Examiner Consider Prior Art with Elements Similar to Those Found in the Udstad '020 Patent, the Wagner '031 Patent, and the Miller '399 Patent?*

■■■ CPR appears to rely on the Udstad '020 Patent, the Wagner '031 Patent,

and the Miller '399 Patent because these patents were not cited by the Patent Examiner when issuing the '575 Patent. The Examiner, however, cited patents that arguably are more relevant to the obviousness determination than those relied on by CPR.

The presumption of validity given to a patent by 35 U.S.C. § 282 sheds light on how much deference this Court gives to a decision by an examiner in the PTO. *See Applied Materials, Inc. v. Advanced Semiconductor Materials America, Inc.*, 98 F.3d 1563, 1570 (Fed.Cir.1996). The presumption imposes the burden of proving invalidity on the party attacking the patent. *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1360 (Fed.Cir.1984).

Because of the presumption of validity under Section 282, the PTO examiner is presumed to have performed his job and be aware of what claims the patent grant allowed. *Al–Site Corp.*, 174 F.3d at 1323; *see Purdue Pharma v. Faulding Inc.*, 230 F.3d 1320, 1329 (Fed.Cir.2000); *Applied Materials*, 98 F.3d at 1570.

If a challenger presents no prior art other than that which the PTO examiner considered, then the challenger will have "the added burden of overcoming the deference due to a qualified government agency presumed to have properly done it's job, which includes one or more examiners who are assumed to have some expertise in interpreting the references and to be familiar from their work with the level of skill in the art and whose duty it is to issue valid patents." *American Hoist & Derrick Co.*, 725 F.2d at 1359. Part of the burden borne by the challenger in this situation is to show that the PTO was wrong in granting the patent. *Id.* at 1360; *see Ultra–Tex Surfaces, Inc. v. Hill Bros. Chem. Co.*, 204 F.3d 1360, 1367 (Fed.Cir. 2000). When relying only on prior art that was before the PTO examiner, "the chal-

lenger's burden is especially difficult." *Al–Site Corp.*, 174 F.3d at 1323 (quoting *Hewlett–Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1467 (Fed.Cir.1990)).

When a challenger comes forward with prior art not considered by the PTO examiner, "there is no reason to defer" to the PTO examiner's decision about the effect on the patent's validity of the unconsidered prior art. *American Hoist & Derrick Co.*, 725 F.2d at 1360; *see Purdue Pharma*, 230 F.3d at 1329. When new prior art is produced, the deference to be given to the PTO examiner is lessened if not completely eliminated. *American Hoist & Derrick Co.*, 725 F.2d at 1360. In this situation, the reviewing court is not faced with the problem of having to disagree with or defer to the PTO examiner. *Id.* Because of the limited deference accorded to the PTO examiner's decision the challenger may find it easier to carry its burden in showing invalidity. *SIBIA Neurosciences.*, 225 F.3d at 1355–56.

Although the presentation of prior art not considered by the PTO examiner may make it easier for the challenger to meet its burden regarding the invalidity of the patent, nothing about whether prior art was or was not considered by the PTO examiner changes the parties' burden of proof or the standard of proof needed. *American Hoist & Derrick Co.*, 725 F.2d at 1360. The presumption of a patent's validity remains. The challenger may overcome this presumption through clear and convincing evidence of the patent's invalidity during an adjudication of the entire suit on the merits or through something less than clear and convincing evidence at the preliminary injunction stage. *See id.; see also Amazon.com*, 239 F.3d 1343, 1350 (Fed.Cir.2001); *Gillette Co. v. S.C. Johnson & Son, Inc.*, 919 F.2d 720, 723 (Fed.Cir.1990).

An examiner may have considered patents other than those cited when the patent was issued. An examiner does not have "to cite all references that may be available, but only the best." 37 C.F.R. § 1.104(c).

That a challenger presents prior art not cited by the examiner also does not change the parties' burdens. The patent is presumed valid. CPR must still raise a substantial question regarding the validity of the '575 Patent. If CPR meets its burden, then NSC must show that CPR's challenge lacks substantial merit.

The examiner cited several references disclosing the same features for which CPR relied on the Wagner '031 Patent. For example, the Baker '887 Patent discloses end truck assemblies, bulkheads, a center sill, U-shaped side sills, a center beam, a floor, and multiple crossbearers. The Baker '887 Patent was cited by the Patent Examiner when issuing the '575 Patent. As the Patent Examiner is presumed to have done his job when issuing the patent and made a determination that the prior art did not render the claims of the '575 Patent invalid for obviousness, it is notable that the Examiner allowed the claims of the '575 Patent in light of the Baker '887 Patent.

The Harris '041 and '175 Patents which were cited by the Patent Examiner in issuing the '575 Patent are similar to the Baker '887 Patent in that the two Harris Patents disclose every element for which CPR relies on the Wagner '031 Patent. Also, the Baker '887 Patent, and the two Harris Patents were assigned to Thrall, the company which also held the Wagner '031 Patent. The Baker '887 Patent and the two Harris Patents were issued after the Wagner '031 Patent. The Wagner '031 Patent is discussed in the specification of the Baker '887 Patent and the two Harris Patents. Given these facts, there is no evidence that the Wagner '031 Patent was a better reference than the Baker '887 Patent or the two Harris Patents. As the Patent Examiner issued the '575 Patent despite the existence of these other three patents, the Wagner '031 Patent either by itself or in combination with other patents relied on by CPR does not raise a substantial question regarding the obviousness of the asserted claims.

Similarly to the Wagner '031 Patent, the Miller '399 Patent reflected teachings of other prior art that was cited by the examiner who issued the '575 Patent. CPR relies on the Miller '399 Patent for its disclosure of end truck assemblies, end wall, a center sill, upper floor sections, an intermediate depressed floor section, a transition section, multiple crossbearers, and side sills. These elements were all disclosed in other references cited by the Patent Examiner.

The Miller '676 Patent, the Yang '821 Patent, and the Adler '028 Patent all disclose each of the elements relied upon by CPR as being in the Miller '399 Patent. Besides having all of the elements disclosed in the Miller '399 Patent, there are other facts that lead to a conclusion that these three patents were better references than the Miller '399 Patent. The Miller '676 Patent was: (1) invented by the same person who invented the Miller '399 Patent, (2) assigned to the same company as the Miller '399 Patent, and (3) was filed a year later than the Miller '399 Patent making it more reflective of rail car technology at the time of the '575 Patent. The Yang '821 Patent is assigned to the same company as both the Miller '399 and Miller '676 Patents. The Yang '821 was also filed after the Miller '399 Patent making it more reflective of rail car technology in the late 1980s. The Adler '028 Patent is assigned to the same company as the Miller '399 Patent, is from the same time frame as the Miller '399 Patent, and dis-

closes the elements of the Miller '399 Patent relied upon by CPR.

The Examiner determined that the '575 Patent should issue despite the existence of the Baker '887 Patent, the Miller '676 Patent, the Yang '821 Patent, and the Adler '028 Patent. Although this is not dispositive on whether the claims of the '575 Patent are invalid, it is further evidence that CPR has not met its burden of raising a substantial question regarding the invalidity of the asserted claims. *See* Findings of Fact, ¶¶ 111–171.

### d. *Secondary Considerations*

■ Secondary considerations may help to decide the obviousness issue. *Graham*, 383 U.S. at 17–18, 86 S.Ct. 684. Secondary considerations that may be taken into account are: (1) long-felt but unsolved need; (2) commercial success; (3) failed efforts of others; (4) copying by others; (5) praise for the invention; (7) unexpected results; (8) disbelief of experts; (9) general skepticism of those in the art; (10) commercial acquiescence; and (11) simultaneous development. *See United States v. Adams*, 383 U.S. 39, 52, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966); *Graham*, 383 U.S. at 16, 17, 86 S.Ct. 684; *Ecolochem*, 227 F.3d at 1379–80; *Monarch Knitting Mach. Corp. v. Sulzer Morat GmbH*, 139 F.3d 877, 885 (Fed.Cir.1998); *Advanced Display Sys. v. Kent State Univ.*, 212 F.3d 1272, 1285–85 (Fed.Cir.1988); *Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1144 (Fed.Cir.1985); *EWP Corp. v. Reliance Universal Inc.*, 755 F.2d 898, 907 (Fed.Cir.1985) *Lindemann Maschinenfabrik v. American Hoist & Derrick Co.*, 730 F.2d 1452, 1461–63 (Fed.Cir.1984).

Although secondary considerations are to be considered in reaching a obviousness determination, these considerations merit attention only to the extent the considerations provide objective indicia of the obviousness of the claimed invention. *See SI-*
*BIA Neurosciences*, 225 F.3d at 1358–59. There must be a nexus between the claimed invention and the secondary considerations before the evidence is relevant to the question of obviousness. *See id.*

The failure of others to invent a depressed center beam flat car before the '575 Patent is a relevant secondary consideration to the question of obviousness. A failure to invent the rail car in the '575 Patent sheds light on whether the invention was obvious to other individuals of ordinary skill in the art.

There was a failure of others to invent the subject matter of the '575 Patent. The Lund drawing and Pritchard disclosure demonstrate that as of the time of the '575 Patent no inventor had been able to design a successful depressed center beam flat car. Although the Lund drawing and Pritchard disclosure are attempts at drawing rail cars similar to what later became the rail car in the '575 Patent, these attempts were failures.

When the '575 Patent was issued, no patents existed for depressed center beam flat cars because no one had been able to figure out how to make a car like this that would meet the standards of the industry and increase the volume of the rail car. That individuals were able to sketch drawings of things that look similar to the rail car in the '575 Patent does not demonstrate that anyone was able to create a workable depressed center beam flat car before the issuance of the '575 Patent.

Copying by others of the design of the '575 Patent is a relevant secondary consideration to the obviousness determination. If the design of the '575 Patent had to be copied later, it is a sign that there were not other workable designs of depressed center beam flat cars before the invention of the '575 Patent.

Other individuals and companies, notably Greenbrier, have copied the design of the rail car in the '575 Patent. There is no evidence that Greenbrier had a depressed center beam flat car in the works before the issuance of the '575 Patent. The first patent that Greenbrier obtained for a dropped deck center beam flat car was the Saxton '085 Patent issued in August 2002, twelve years after the '575 Patent was issued. CPR concedes that the asserted claims read on the accused rail cars produced by Greenbrier.

The long felt need and demand for depressed center beam flat cars is also a relevant secondary consideration to the obviousness determination. That companies in the business wanted a depressed center beam flat car demonstrates that there was an incentive to build this type of rail car if a workable design of it was invented.

There was a long felt need and demand for a rail car with similar properties as the rail car in the '575 Patent. At the time of the invention of the '575 Patent, there was a demand for center beam cars with a greater volume than the standard center beam flat cars. That Mr. Lund, Mr. Pritchard, Mr. Galbraith, and Mr. Woolston, tried to come up with a center beam car that had a depressed floor demonstrates that there was at least some demand in the rail car industry for such a car. None of the rail cars brought to the attention of the Court by the parties met the demands of having a rail car with greater volume than the standard center beam flat car that was in existence before the invention of the '575 Patent.

Commercial success of the depressed center beam flat cars is also a relevant secondary consideration. Commercial success demonstrates there were incentives for inventing this type of rail car.

Although the inventors of the '575 Patent did not reap commercial success from the '575 Patent, the invention covered in the '575 Patent is a commercial success. The request for quote from CPR specifically requested dropped deck center beam cars. The car forming the basis of NSC's bid was the commercial embodiment of the '575 Patent. The car forming the basis of Greenbrier's winning bid, the GBRX 20003, infringes the '575 Patent. The total purchase price being paid by CPR to Greenbrier is [Redacted] These facts taken together show that the invention covered by the '575 Patent is a commercial success.

After comparing the asserted claims and the prior art and reviewing the secondary considerations, the Court finds that a substantial question has not been raised with respect to whether the asserted claims would have been obvious at the time of the invention to a person of ordinary skill in the art. Even if a substantial question has been raised, NSC has shown that CPR's obviousness defense lacks substantial merit. *See* Findings of Fact, ¶¶ 25, 39, 54, 188–210.

### 4. *Use of Expert Testimony and Animation / Illustrations*

In arguing that the patent is invalid, CPR relied almost exclusively on the testimony of its expert, Wayne Clowers. A major part of Mr. Clowers's testimony was the presentation of a computer animation and illustrations of the Udstad reference and the 575 patent. NSC has raised many objections to Mr. Clowers's testimony, and to the accuracy of the computer animation and illustrations. The Court agrees with some of those objections.

■■■ Mr. Clowers was an honest witness who appeared to testify to his sincere beliefs, based on many years of experience in the railcar industry. He appears, however, to lack the knowledge of patent law and of how the PTO operates to make many of his opinions reliable. For example, he never checked whether the refer-

ences on which he based his opinion were merely cumulative of other references that were cited by the Examiner. Nor did he appear to understand what a means-plus-function element is.

On the other hand, the testimony of the plaintiff's expert, Roger Sims, appeared to follow more closely the dictates of the law and was more faithful to the language in the relevant patents and to the definitions, in the Cyclopedia to which the parties have referred.

■ The Court also has concerns about the computer animation and illustrations submitted by the defendants. These animations and illustrations purported to illustrate railcars conforming to the Udstad reference and the 575 patent. These animations and illustrations omitted, however, several features of the Udstad reference and certain claims from the 575 patent. Nor were they depictions of any drawing in either of the patents. Finally, the Udstad reference does not use the terms the animation uses in describing the parts of the Udstad reference. Although the Court finds that there was no intent to mislead the Court with the animation and illustrations, the Court did find the animations and illustrations, at best, confusing and, at worst, somewhat misleading.

### C. *Enforceability*

CPR argues that the '575 Patent is unenforceable due to inequitable conduct before the PTO. The alleged inequitable conduct is that the inventors of the '575 Patent caused a paper to be filed with the PTO that falsely asserted that the inventors' failure to pay the maintenance fee that was due to the PTO in August 1998 was unintentional.

■ A patent may be found to be unenforceable due to inequitable conduct before the PTO. *See PerSeptive Biosystems, Inc. v. Pharmacia Biotech., Inc.,* 225 F.3d 1315, 1319 (Fed.Cir.2000); *Kings-*

*down Med. Consultants v. Hollister, Inc.,* 863 F.2d 867, 877 (Fed.Cir.1988) (en banc). Determination of inequitable conduct is a two step analysis. First, there must be a threshold showing of both materiality and intent to mislead the PTO. *See PerSeptive Biosystems, Inc.,* 225 F.3d at 1318–19. Second, after a threshold showing has been made on both elements, the Court weighs the actual level of materiality and the actual level of intent to determine if inequitable conduct occurred before the PTO. *See id.* at 1319; *Life Techs. v. Clontech Labs., Inc.,* 224 F.3d 1320, 1324 (Fed. Cir.2000). As with infringement and validity, if CPR raises a substantial question regarding enforceability, then NSC must show that the defense lacks substantial merit in order for it to show a likelihood of success on the merits. *See Amazon.com,* 239 F.3d at 1350–51; *Nutrition 21,* 930 F.2d at 869.

■ The Court finds that there is no evidence to support the claim that the inventors intentionally failed to pay the maintenance fee.

Mr. Flores thought that Mr. Dominguez was paying the maintenance fee. Mr. Flores testified that he and Mr. Dominguez had agreed that Mr. Dominguez would assume responsibility for paying the maintenance fees. Mr. Flores also testified that he first learned that the maintenance fee had not been paid from Mr. Smith, an NSC attorney inquiring about purchasing the '575 Patent. When asked about Mr. Flores's reaction to learning that the maintenance fee had not been paid, Mr. Smith testified that Mr. Flores was surprised about that. Mr. Flores's reliance on Mr. Dominguez to pay the maintenance fee does not evidence an intent or choice by Mr. Flores that the maintenance fee not be paid.

Mr. Dominguez's oversight in failing to pay the maintenance fee was unintentional.

Mr. Dominguez testified under oath that he was so busy running his manufacturing facility that he forgot to pay the maintenance fee for the '575 Patent. This testimony is credible because at the time the maintenance fee was due, Mr. Dominguez testified that he was working six or seven days a week, sixteen hours a day dealing with customers, employees, and the government.

Additionally, in early 2000, when Mr. Smith contacted the inventors regarding the '575 Patent, both Mr. Flores and Mr. Dominguez confirmed that they had not intended to let the '575 Patent lapse. When Mr. Smith concluded the negotiations with the inventors, he wrote a letter confirming that the inventors had told him that they did not intend to let the '575 Patent expire for failure to pay the maintenance fee. Mr. Smith's partner, George Limbach, filed a petition with the PTO to revive the '575 Patent stating that "the delay in payment of the maintenance fee was unintentional." On May 1, 2000, after receiving and considering the petition, the PTO reinstated the '575 Patent.

Because the evidence shows that Mr. Flores and Mr. Dominguez unintentionally failed to pay the maintenance fee due in August 1998, the Court finds that CPR's claim of inequitable conduct lacks substantial merit. *See* Findings of Fact, ¶¶ 6–20.

## II. *Irreparable Harm*

In patent cases, irreparable harm is presumed where the patentee has clearly shown that it is likely to prevail on the merits. *See Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 705, 708 (Fed.Cir.1997); *Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 973 (Fed.Cir.1996). Conversely, the presumption is not applicable when the patentee has not clearly shown both patent validity and infringement. *See Amazon.com, Inc.*

*v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed.Cir.2001)

This presumption is peculiar to preliminary injunctions in patent cases and "acts as a procedural device which places the ultimate burden of production on the question of irreparable harm onto the alleged infringer." *Polymer Techs.*, 103 F.3d at 974 (quoting *Reebok Int'l Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1556 (Fed.Cir.1994) (citations omitted)). As the Federal Circuit has explained, this presumption is grounded in the patent itself:

> Because of the very nature of a patent, which provides the right to exclude, infringement of a valid patent inherently causes irreparable harm . . . .
>
> Years after infringement has begun, it may be impossible to restore a patentee's (or an exclusive licensee's) exclusive position by an award of damages and a permanent injunction.

*Id.* at 975–76 (citations omitted).

Accordingly, this presumption is only overcome where the Court makes a "finding clearly negating" the presumption. In *Polymer Technologies*, the Federal Circuit set forth examples of what could constitute clear negation: the non-movant has or will stop infringing; the movant has granted exclusive licenses under its patent such that it may be reasonable to expect that the invasion of the patent right can be recompensed with a royalty rather than an injunction; or the movant has delayed in bringing suit. *Id.* at 974.

Because NSC has made a clear showing that it will prevail on the merits, there is a presumption that it will be irreparably harmed by CPR's use of the accused rail cars.

Relying primarily on *High Tech Medical Instrumentation, Inc. v. New Image Industries, Inc.*, 49 F.3d 1551, 1557 (Fed.Cir. 1995), CPR argues that the presumption of

irreparable harm is rebutted because NSC wrote a letter to Gunderson and Greenbrier stating that those two companies may wish to obtain a license. In *High Tech*, the court held that there was no presumption of irreparable harm and that even if there were a presumption, the plaintiff's offer to license the patent to the defendant, combined with the plaintiff's delay, was sufficient to rebut it.

■ CPR construes *High Tech* more broadly than this Court believes is appropriate. *High Tech* does not purport to change the preexisting law that a pattern of licensing under the patent may rebut the presumption. In a very brief decision, without description of the underlying facts, the *High Tech* court stated in dictum that an offer to license combined with undue delay would rebut the presumption. It is not clear from the decision whether the offer to license in that case was a definite one that included the terms of the license. In this case, the letter, which was drafted by outside counsel, did not discuss any terms of a potential license. There were no internal discussions at NSC about licensing the '575 Patent to Greenbrier nor were there ever licensing discussions between Greenbrier and NSC. Nor has NSC ever issued a license under any of its patents, delayed in bringing this action, or sent any other similar letters. The other letters that NSC sent to third parties regarding the '575 Patent only provide notice of the '575 Patent.

■ Even if NSC could not benefit from the presumption, it has shown that irreparable harm would result without the issuance of a preliminary injunction. The irreparable harm that would be suffered by NSC is: (1) violation of NSC's exclusive rights under the '575 Patent; (2) damage to NSC's market position; (3) harmful impact on market share and pricing structure; (4) lost profits as a result of CPR's infringement; and (5) unpredictable potential injury.[3]

NSC's patent gives it exclusive rights to exclude others from the market regardless of whether the market is big or small. CPR's use of the accused rail cars infringes NSC's exclusive rights. CPR purchased the accused rail cars to be the market leader and secure a competitive advantage by being the first to market with this type of rail car. [Redacted] Getting a commitment for this much business from Canfor and Weyerhaeuser has reduced the incentives for CPR's competitors to purchase dropped deck center beam flat cars. CPR's competitors would also be NSC's potential customers. CPR's strategy has restricted NSC's ability to market its dropped deck center beam car and irreparably violated NSC's exclusive rights under the '575 Patent.

---

3. Irreparable harm can be shown by demonstrating that monetary damages are an inadequate remedy. A number of factors can be considered in making this determination. Among these are whether continuing infringement will damage the plaintiff's position in the market or its market share; whether continued infringement would threaten the survival of the plaintiff's business; whether the plaintiff and the defendant are direct competitors trying to influence the same group of consumers; whether the plaintiff spent a large sum of money on market development; whether continued infringement would have a harmful impact on the plaintiff's market share and pricing structure; whether the plaintiff will lose substantial profits from continued infringement; and, whether continued infringement would disparage the reputation of the plaintiff or its product. *See Canon Computer Sys., Inc. v. Nu–Kote Int'l, Inc.*, 134 F.3d 1085, 1090 (Fed.Cir.1998); *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1456 (Fed.Cir. 1988); *Telebrands Direct Response Corp. v. Ovation Communications, Inc.*, 802 F.Supp. 1169, 1178 (D.N.J.1992); *Jacobson v. Cox Paving Co.*, 19 U.S.P.Q.2d 1641, 1653, 1991 WL 328445 (D.Ariz.), *aff'd*, 949 F.2d 404, 1991 WL 216460 (Fed.Cir.1991).

CPR is attempting to control the entire market for dropped deck center beam cars. CPR has purchased [Redacted] accused rail cars in addition to the [Redacted] accused rail cars it purchased for its business with Canfor and Weyerhaeuser. These extra rail cars are to be offered to other shippers to lure the shippers away from CPR's competitors. CPR intends to ensure that it controls the market for dropped deck center beam cars. CPR's obtaining control of the dropped deck center beam flat car market through its use of the accused rail cars irreparably harms NSC.

There is a market for dropped deck center beam flat cars, and CPR seeks to exploit this market through its use of the accused rail cars. Whenever a new product is introduced to the market, the company that introduced it first has a first to market advantage. Greenbrier boasted of this advantage in its October 28, 2002 press release announcing its receipt of the contract from CPR. By virtue of CPR's contract with Greenbrier, it is CPR and Greenbrier that are showing dropped deck center beam cars to potential customers. NSC is being deprived of this benefit through CPR's use of the accused rail cars.

NSC's first to market advantage is being taken away by CPR's use of the accused rail cars. Because of the advantages associated with being first to market, NSC's market share will be harmed by CPR's use of the accused rail cars. NSC is also being deprived of the rights it has under the '575 Patent to set its own price for dropped deck center beam cars. To maintain market share, NSC will be forced to compete with the price offered by companies infringing its patent for dropped deck center beam flat cars.

By not receiving the CPR contract, NSC has lost profits. A loss of profit prevents NSC from building its business in the same way that it would have if it had made the profits. Because it is difficult to know what the effects on NSC are of losing the profit it would have received from the CPR contract, the harm suffered is irreparable.

The potential injury to be suffered by NSC is not predictable. It is difficult to quantify what advantages NSC would have realized in being the first to market with the dropped deck center beam flat car or how much NSC has been harmed through damage to its market position, loss of market share, price erosion, and lost profit. The difficulty in quantifying these harms demonstrates that the harms are irreparable.

NSC has clearly shown that it is likely to prevail on the merits. This allows it to benefit from a presumption of irreparable harm. Even if this presumption has been rebutted, NSC has shown that it will suffer irreparable harm from CPR's infringement of the '575 Patent.[4] *See* Findings of Fact, ¶¶ 28, 32, 35–38, 42, 60–61, 64, 70–75, 87–101.

### III. *Balance of Hardships*

 After considering the likelihood of success on the merits and irreparable harm, a court must balance the hardships the respective parties will suffer from granting or withholding the injunction. *Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 707–08 (Fed.Cir.1997); *Hybritech Inc. v. Abbott*

---

4. CPR has also argued that NSC was not irreparably harmed because any harm suffered by NSC is self-inflicted. Def. Opp. at 48–49. Such an argument appears to be inconsistent with the patent laws which by their nature allow a holder of a patent to make business decisions about what to do with its patent without being forced to compete with individuals or companies that infringe the patent.

*Labs.*, 849 F.2d 1446, 1457 (Fed.Cir.1988). Even where a court concludes that neither party has a "clear advantage" as to the hardship factor, the Court may enter a preliminary injunction. *Hybritech Inc.*, 849 F.2d at 1457–58.

NSC has shown that it will suffer hardships. There is the irreparable harm presumed to be suffered by NSC when its patent is being infringed. Additionally, NSC's market share is being harmed, it has lost the potential to be first to market, it will have to cut prices on dropped deck center beam flat cars to match the prices offered by an infringing competitor, and it is losing out on the benefits associated with having a valid, enforceable patent.

These harms are to be weighed against the hardships that would be suffered by CPR if an injunction is granted. The hardships that would be suffered by CPR will be limited. [Redacted]

Additionally, CPR currently uses approximately standard center beam flat cars to make trips wholly within Canada. Under the schedule providing for receipt of the cars, CPR will not receive in excess of [Redacted] cars until sometime in [Redacted] Until this time, the dropped deck center beam flat cars could be used entirely in Canada, and part of CPR's current standard center beam fleet could service destinations in the United States. CPR is also scheduled to receive an additional [Redacted] standard center beam cars from Greenbrier which can help with demand. CPR does have contracts with Canfor and Weyerhaeuser based on its being able to use the dropped deck center beam flat car, but it has not offered evidence to show that being enjoined from using these cars would damage its relationship with either lumber company. It will be able to use [Redacted] of the dropped deck center beam flat cars in Canada, shift standard center beam cars that had been used for destinations wholly in Canada to routes

serving the United States, and it will have the additional [Redacted] standard center beam cars to help cover demand for shipping services.

Finally, CPR was well aware of the potential problems with patent infringement that could arise with the accused rail cars as the indemnity agreement specifically protected CPR for damages incurred if the accused rail cars were found to infringe the '575 Patent.

Balancing the respective hardships that would be suffered by the parties depending on the outcome of this preliminary injunction motion, the balance weighs in favor of granting NSC's motion for a preliminary injunction. *See* Findings of Fact, ¶¶ 55–59, 71, 85–91.

IV. *Public Interest*

 In patent cases, "the focus of the district court's public interest analysis should be whether there exists some critical public interest that would be injured by the grant of a preliminary relief." *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1458 (Fed.Cir.1988). Courts have only in rare instances exercised their discretion to deny injunctive relief in order to protect the public interest, generally in instances where the public health was at stake. *Rite–Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1547–48 (Fed.Cir.1995) (en banc) (citing instances).

Where a likelihood of infringement has been shown, the public interest is almost always served by vindicating the patentee's rights. *See Smith Int'l, Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1581 (Fed.Cir.1983). The public policy behind granting a patent monopoly is vitiated if infringers are permitted, under the court's tacit permission, to take out a "litigation license" for which the patentee never negotiated or bargained. *See Augat, Inc. v. John Mezzalingua Assoc., Inc.*, 642

F.Supp. 506, 508 (N.D.N.Y.1986). In addition, the fact that an infringer is selling a lower priced product does not justify allowing it to infringe valid patent rights. *See Payless Shoesource, Inc. v. Reebok Int'l Ltd.*, 998 F.2d 985, 991 (Fed.Cir.1993) (noting that such a justification for patent infringement would cause most injunctions to be denied "because copiers universally price their products lower than innovators").

NSC has shown a likelihood of infringement. Unless there is a critical public interest weighing against the granting of the injunction in this situation, then the injunction should issue. CPR's arguments regarding public interest presuppose that the patent is not being infringed because of the temporary presence of the accused rail cars, that the '575 Patent is invalid because it was anticipated and obvious, or that the '575 Patent is unenforceable because it was revived through inequitable conduct. As each of these defenses raised by CPR fails, there is no public interest identified by CPR that would justify not granting the preliminary injunction.

As NSC prevails on each of the four factors to consider when deciding a preliminary injunction motion, the motion is granted.

### V. *The Bond to be Posted by NSC*

■ The Court will impose a bond of $250,000. The defendants requested a bond of over $8,000,000; but there is no basis in this record for such a high bond.

The purpose of the bond requirement of Federal Rule of Civil Procedure 65(c) is "to enable a restrained or enjoined party to secure indemnification for the costs ... and pecuniary injury that may accrue during the period in which a wrongfully issued equitable order remains in effect." Because the Court is prepared to conduct a final trial in this matter in the spring of 2003 and it appears that any additional discovery can be completed by that time, the relevant time period is from now until the final judgment in the case.

$250,000 should more than adequately compensate the defendants for any injury incurred during this period. CPR has a broad indemnity agreement from Greenbrier. In addition, the financial harm from a preliminary injunction identified by the defendants is not supported by the record, and is speculative. One of these four bases of financial harm suggested by the defendants—costs of development of the accused rail cars—is irrelevant to the bond analysis because these costs were incurred before the issuance of the injunction and will not be wasted. If the injunction is lifted, the defendants may buy and use the accused rail cars. *See* Findings of Fact, ¶¶ 55–59.

### CONCLUSION

Because NSC has established each of the requisite elements for obtaining a preliminary injunction, the Court will grant NSC's motion. A bond pursuant to Federal Rule of Civil Procedure 65(c) in the amount of $250,000 is appropriate.

An appropriate Order follows.

### ORDER

AND NOW, this 6th day of January, 2003, upon consideration of National Steel Car's Motion for a Preliminary Injunction (Docket No. 5), the defendant's opposition thereto, the plaintiff's reply thereto, and supplemental filings by the parties, and following an evidentiary hearing held on December 11 and 12, 2002, IT IS HEREBY ORDERED that for the reasons contained in the accompanying memorandum of today's date, National Steel Car's motion is GRANTED. It is therefore ORDERED that:

Canadian Pacific Railway, Ltd., Canadian Pacific Railway Company, 3942503 Canada, Inc., and Delaware & Hudson Railway Company, Inc. and any and all of their affiliates, subsidiaries, parent companies, employees, agents, officers, directors, attorneys, successors and assigns, and all those acting on behalf of or in active concert and participation with any of them, are HEREBY PRELIMINARILY ENJOINED AND RESTRAINED, pending the final hearing and determination of this cause or until further Order of this Court, from making, using, offering to sell, or importing the GBRX 20003 depressed center beam flat car in the United States.

National Steel Car shall within ten (10) days of this Order of Preliminary injunction post a bond with the Clerk of the Court in an amount of $250,000, pursuant to Federal Rule of Civil Procedure 65(c). This Order of Preliminary Injunction shall take effect upon the posting by National Steel Car of the $250,000 bond.